**LEVI & KORSINSKY, LLP**
Eduard Korsinsky (EK-8989)
235 Main Street
Hackensack, New Jersey 07601
Tel.:  (973) 265-1600
Email: ek@zlk.com

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMANDA BEEZLEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>FENIX PARTS, INC., KENT ROBERTSON, SCOTT PETTIT, BMO CAPITAL MARKETS CORP., STIFEL, NICOLAUS & COMPANY, INCORPORATED, BB&T CAPITAL MARKETS, and BARRINGTON RESEARCH ASSOCIATES, INC.<br><br>Defendants. | Case No. 2:17-cv-00233-SRC-CLW<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u><br><br>Judge: Hon. Stanley R. Chesler |

Co-Lead Plaintiffs Thomas Weeks, Douglas Barnard, and Keith B. White, (collectively "Plaintiffs"), individually and on behalf of all other persons similarly

situated, by their undersigned attorneys, allege in this Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint") the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Fenix Parts, Inc. ("Fenix" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Fenix's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable in the public domain.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares of Fenix securities: (i) in Fenix's initial public offering on May 15, 2015 (the "IPO"); and/or (ii) on the public market between May 15, 2015 and June 28, 2017, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities

laws under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Each of Defendants' misrepresentations and/or omissions concealed the fact that Fenix did not have the appropriate internal controls over inventory valuation and goodwill, that Fenix published financials relating to inventory and goodwill that were materially false and misleading, that Fenix could not acquire one to three companies per quarter because of its lack of internal controls and liquidity issues, and could not continue as a going concern.  Plaintiffs assert claims under the Securities Act and the Exchange Act arising from these misrepresentations.  The Securities Act claims are not based in fraud, but rather negligence and/or strict liability.

3.      Fenix's  Registration  Statement[1]  similarly  contained  omissions concerning the Company's internal controls over inventory valuation and goodwill, and made misrepresentations as to Fenix's financials relating to inventory and goodwill.  The Registration Statement also misrepresented that Fenix could acquire one to three companies per quarter.  The truth of these matters should have been

---

[1] "Registration Statement" refers to Fenix's Registration Statement on Form 424B4 filed with the SEC on May 15, 2015.

disclosed at the time of the IPO, but were not disclosed due to Defendants' negligence. These weaknesses were ultimately disclosed and resulted in the delisting of the stock from NASDAQ. Additionally, the SEC has launched a formal investigation against the Company, and the SEC has issued a subpoena to Fenix focused upon the Company's change in its independent registered public accounting firm, its previously-announced business combinations and related goodwill impairment charge, the effectiveness of its internal control over financial reporting, and its inventory valuation methodology. The SEC investigation is still ongoing.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the Company is headquartered in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

6.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## PARTIES

7.     Co-Lead Plaintiff Thomas Weeks ("Weeks") purchased Fenix common stock at artificially-inflated prices during the Class Period and was damaged upon the revelation of Defendants' misrepresentations.   Weeks previously filed his certification evidencing his transactions in Fenix securities with the Court in connection with his motion for appointment as Lead Plaintiff.  Weeks' shares are traceable to Fenix's IPO.  Week's certification is incorporated herein by reference.

8.     Co-Lead Plaintiff Douglas Barnard ("Barnard") purchased Fenix common stock at artificially-inflated prices during the Class Period and was damaged upon the revelation of Defendants' misrepresentations. Barnard previously filed his certification evidencing his transactions in Fenix securities with the Court in connection with his motion for appointment as Lead Plaintiff.  Barnard's shares are traceable to Fenix's IPO.   Barnard's certification is incorporated herein by reference.

9.     Co-Lead Plaintiff Keith B. White ("White") purchased Fenix common stock at artificially-inflated prices during the Class Period and was damaged upon the revelation of Defendants' misrepresentations. White previously filed his certification evidencing his transactions in Fenix securities with the Court in connection with his motion for appointment as Lead Plaintiff.  White's shares are traceable to Fenix's IPO.  White's certification is incorporated herein by reference.

10.     Defendant Fenix is incorporated in Delaware and headquartered in Westchester, Illinois.  Fenix maintains a "state-of-the art" full-service recycling facility in Rahway, New Jersey. This is one of twelve full-service facilities, which are concentrated in the Northeastern and Southeastern United States and Southeastern Canada. Fenix securities trade on NASDAQ under the ticker "FENX."

11.     Defendant Robertson was, at all relevant times, the Chief Executive Officer ("CEO") and a director of the Company.  Robertson signed the Company's Registration Statement as CEO of the Company.

12.     Defendant Scott Pettit ("Pettit") was, at all relevant times, Chief Financial Officer ("CFO") of Fenix.  Petit also signed the Company's Registration Statement as CFO.

13.     Defendant BMO Capital Markets Corp. ("BMO Capital Markets") served as one of the underwriters of the Company's IPO. In connection with the IPO, the underwriters received an underwriting discount in the amount of $7,728,000 plus reimbursement of up to $1.1 million for reasonable out-of-pocket expenses.

14.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") served as one of the underwriters of the Company's IPO. In connection with the IPO, the underwriters received an underwriting discount in the amount of $7,728,000 plus reimbursement of up to $1.1 million for reasonable out-of-pocket expenses.

15.     Defendant BB&T Capital Markets, ("BB&T") served as one of the underwriters of the Company's IPO. In connection with the IPO, the underwriters received an underwriting discount in the amount of $7,728,000 plus reimbursement of up to $1.1 million for reasonable out-of-pocket expenses.

16.     Defendant Barrington Research Associates, Inc. ("Barrington") served as one of the underwriters of the Company's IPO. In connection with the IPO, the underwriters received an underwriting discount in the amount of $7,728,000 plus reimbursement of up to $1.1 million for reasonable out-of-pocket expenses.

17.     "Section 11 Defendants" refers to Defendants Fenix, Robertson, Pettit, BMO Capital Markets, Stifel Nicolaus, BB&T, and Barrington.

18.     "Section 15 Defendants" refers to Defendants Robertson and Pettit.

19.     "Section 10(b) Defendants" refers to Defendants Fenix, Robertson, and Pettit.

20.     "Section 20(a) Defendants" refers to Defendants Robertson and Pettit.

21.     The Section 15 Defendants and Section 20(a) Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Fenix's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Section 15 Defendant and Section 20(a) Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to,

or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

22.     The Section 20(a) Defendants, because of their positions and access to material non-public information available to them, knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

23.     Fenix is liable for the acts of the Section 15 Defendants and Section 20(a) Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

24.     The scienter of the Section 20(a) Defendants and other employees and agents of the Company would similarly be imputed to Fenix under *respondeat superior* and common law agency principles.

## **CONFIDENTIAL WITNESS**

25.     Confidential Witness ("CW1") was a Finance Consultant for Fenix from December 2015 until June of 2016.  CW1 was hired as consultant to lead a data warehousing project for Fenix Parts.  CW1 was employed for seven or eight months, and CW1's goal was to provide a consolidated and consist view of the eight original companies.  CW1 said there were difficulties: even though many of the companies

used the same software, they had each made different assumptions.  For instance, some companies had included destination costs in their inventory and the companies were using different names across the companies for the same thing. CW1 ended up writing a set of software translators to move information from system to system and also established a standard nomenclature.  CW1 said that at the end of CW1's project, CW1 knew that Fenix did not have the resources to create a single united system for looking at inventory and the data warehousing plan was never implemented.  CW1's work was taken over by John Blaseos, the current EVP.  CW1 stated that Blaseos did not understand the work, but still wanted to take it over.

26.    CW1 stated that CW1 knew that Fenix had problems with inventory evaluation.  CW1 was aware that inventory evaluation was a point of controversy with the auditors, and CW1 thought the reason for the change was because Fenix could not come to an agreement with the original auditors regarding inventory valuation.

27.    CW1 stated there were 7 to 12 auditors working at Fenix all the time. CW1 said that Fenix was trying to get its inventory processes verified, but the auditors that Fenix had hired could not be educated as to the complexities of the inventory.

## SUBSTANTIVE ALLEGATIONS

**A.    Fenix's Background and the Initial Public Offering**

28.     Fenix is engaged in the recycling and resale of automotive products.
Fenix was created in January 2014 in order to merge eight different companies,
consisting of 11 business entities (the "Founding Companies").  Through November
2014, Fenix entered into agreements with the owners of each of the Founding
Companies to combine their businesses.  The aggregate consideration to be paid by
Fenix consisted of approximately $93,203,308 in cash, approximately 3,157,750
shares of Fenix common stock, and approximately 1,330,000 exchangeable
preferred shares of its subsidiary, Fenix Parts Canada, Inc.  The cash portion of the
consideration was subject to adjustments based upon the Founding Companies'
working capital on the closing date, capital expenditures during the six months
preceding the closing of the Founding Companies, and certain other factors.  The
stock portion of the consideration was subject to adjustment based on the public
offering price.  According to Fenix, the consideration to be paid to the owners of the
Founding Companies was determined by arms-length negotiations between Fenix
and representatives of each Founding Company.

29.     However, Fenix did not obtain independent valuations, appraisals, or
fairness opinions to support the consideration that they agreed to pay for the
Founding Companies.  Instead, Fenix "relied on the experience and judgment of our
management and our evaluation of the potential synergies that could be achieved in
combining the operations of the Founding Companies."  Since Fenix disclosed that

at the time of the IPO, "Fenix has no operations at this time and has two employees," Fenix apparently relied purely on Robertson and Pettit to negotiate with the Founding Companies.  Since Robertson and Pettit were hired by the owners of the Founding Companies in order to start Fenix, this was not an arms-length negotiation.

30.    In order to fund the acquisitions of the Founding Companies, company officials decided to take Fenix public.  Fenix indicated that the net proceeds from the sale of 12,000,000 shares of the Company's common stock in this offering, after deducting underwriting discounts and commissions and expenses, would be approximately $88.2 million (approximately $101.6 million after the underwriters exercise their option to purchase an additional 1,800,000 shares).  Fenix also stated that it intended to use the net proceeds from the IPO, plus up to $11.5 million of borrowings and letter of credit utilization under a credit facility to be entered into with BMO Harris Bank N.A., ("Credit Facility"), to pay the approximately $93.2 million cash portion of the consideration for the Founding Companies.  The cash portion of the consideration was to be adjusted upward, based upon the Founding Companies' working capital on the closing date of the acquisitions and certain other factors, by approximately $6.5 million.

31.    Accordingly, although Fenix was a shell of a company with only two employees, the Section 10(b) Defendants took Fenix public on May 15, 2015. Although Fenix was motivated to take Fenix public at $10 per share due to

11

provisions that obligated the holders of the common stock issued in January 2014 to compensate the investors in the later sales if the IPO price of Fenix common stock was less than $10.00 per share, Fenix was forced to price its IPO at $8 per share due to a lack of interest in Fenix stock.

32.     Initially, Fenix wanted to go public at $10 per share due to agreements that related to the common stock sales in March, April and September 2014 (before the Company went public) and included provisions that obligated the holders of the common stock, including Robertson and Pettit, to compensate the investors in the First Bridge Offering and the Second Bridge Offering if the IPO price of Fenix common stock was less than $10.00 per share. As the IPO price was $8.00 per share, Robertson was forced to transfer 98,846 shares of Fenix common stock, and Mr. Pettit was forced to transfer 26,359 shares of common stock.  This resulted in a loss to Robertson of $790,768 and to Pettit of $210,872.  Had Robertson and Pettit not misled investors these losses would have been even larger.

33.     Despite Robertson's and Pettit's initial loss from the IPO, they both benefitted financially. By taking Fenix public, Defendants Robertson and Pettit substantially benefitted as the shares they held increased dramatically in value overnight due to their newfound liquidity on the NASDAQ exchange.  While the shares held by the Section 10(b) Defendants were subject to lock-up agreements, the Section 10(b) Defendants were still able to benefit from the increase in value by

using the shares as collateral for various other transactions as well as selling the shares on the open market once the lock-up agreements expired.  At an IPO price of $8.00 per share, Robertson held over $6.24 million of Fenix stock and Pettit held over $1.92 million in stock that was previously worth far less due to the fact that it was not publicly traded on the NASDAQ exchange.

34.    In order to raise interest in the IPO, Robertson and Pettit misrepresented to investors that in addition to the Founding Companies, Fenix would acquire an additional 10 - 15 companies in the next two years, consisting of one to three acquisitions per quarter.  The Registration Statement stated that the acquisition of other automotive products recycling businesses was a key element of its strategy. Fenix stated that it intended to actively pursue acquisitions to increase customer and route density within its network and expand into new geographic markets, using a disciplined approach to identify and evaluate acquisition candidates. Fenix specifically stated that its "goal [was] to complete between 10 and 15 acquisitions, ranging in size between $5 million and $10 million in revenue, in the near to mid-term following the completion of this offering.

35.    To this end, Fenix acquired an additional three companies between August 18, 2015 and October 9, 2015 (collectively with the Founding Companies, the "Acquired Companies").  However, since then, Fenix has not acquired a single company due to its lack of internal controls over inventory valuation and goodwill,

violation of the Credit Facility's covenants, and inability to continue as a going concern.

**B.     Inventory Valuation & Goodwill Impairment**

36.     Fenix indicated to investors on its Registration Statement that it evaluates its inventory valuation and goodwill impairment on an ongoing basis. Fenix's inventories consist of parts acquired from damaged, totaled, and low-value cars.  The cost of inventory is established based upon the price paid for the vehicle along with other consequential costs.  After dismantling the vehicle, each part is assigned a cost using the average cost to sales percentage and applying that percentage to inventory at the expected selling price.  The selling price is derived from historical prices.

37.     Fenix stated on its registration statement that consolidated inventories consisted of $42,190,000 as of December 31, 2014.  However, over the next year, Fenix disclosed that those inventories were actually over $14.8 million less than they represented.  On Fenix's Form 10-K dated April 14, 2016, inventories from the Founding Companies was estimated at $41.177 million on June 30, 2015, and by December 31, 2015, re-estimated downward to $38.110 million, a decrease of $4.08 million since the IPO.  Fenix did not provide a reason for this write down in its Form 10-K.

38.     Further, Fenix reduced its value of inventory by an additional $7.3 million during the three months ending March 31, 2016, and by an additional $3.5 million during the three months ended June 30, 2016.  Fenix stated it took these reductions   to reflect the most recent historical information available regarding excess and unsaleable parts acquired as well as sales discounts given to sell certain acquired parts.  The Company disclosed that the information needed for the additional $3.5 million written down in June 30, 2016 was actually available in March 2016, but Fenix still failed to disclose the write down to investors.  This resulted in a decrease in the value of Fenix's inventory of $14.88 million in under a year.  These reductions had a material impact on Fenix's goodwill and also on Fenix's Credit Facility's borrowing base.

39.     Goodwill represents the excess of the amount Fenix pays for its acquisitions over the fair value of the acquired net assets, including inventory. Therefore, whenever Fenix reduces inventory from its acquired companies, it must also increase goodwill.  Fenix's Registration Statement reported that goodwill of the Founding Companies consisted of $58,879,000 as of December 31, 2014.  After telling investors that goodwill would range from $50 million to $65 million (Q1 2015 Form 10-Q, at 10), this amount inflated to an outrageous $83,671,000 as of March 31, 2016 for all of the acquired companies, an increase of $24.792 million. (Fenix ultimately impaired its goodwill the following year.)

40.     Fenix tested for goodwill impairment on an annual basis based upon a fair-value approach.  Fenix first did a qualitative assessment to determine whether it is more likely than not that a reporting unit's fair value is in excess of its carrying value.  If not, or if Fenix elected to not perform a qualitative assessment, the Company then performed a quantitative impairment test.  The first step of the quantitative test includes estimating the fair value of the reporting unit and comparing that estimated fair value to the reporting unit's carrying value.  If fair value exceeds carrying value, then no impairment is deemed to exist.  Otherwise, Fenix uses that estimated fair value as a hypothetical purchase price for the reporting unit to determine the resulting "implied" goodwill.  An excess of a reporting unit's recorded goodwill over its "implied" goodwill is reported as an impairment charge.

41.     Fenix allegedly performed these goodwill impairment tests annually during the fourth quarter and between annual tests whenever events or circumstances indicated that an impairment may have existed.  Fenix is required to evaluate events and circumstances that may affect the performance of the reporting unit and the extent to which the events and circumstances may impact the future cash flows of the reporting unit.  However, as stated on February 21, 2017, Fenix did not have adequate internal controls or procedures "to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, contingent consideration, ***potential goodwill impairment and inventory valuation***."

42.     As a result of its lack of adequate internal controls, decrease in inventory valuation, and increase in goodwill, Fenix was forced to take an impairment charge of $43.3 million just one year after the IPO.  This also resulted in a violation of Fenix's Credit Facility.  In less than two weeks after the announcement of the impairment charge, Fenix announced that it had changed auditors on July 8, 2016 from BDO USA, LLP ("BDO") to Crowe Horwath LLP. Subsequently, the SEC began an investigation into Fenix focused on the Company's recent change in its independent registered public accounting firm, its previously announced business combinations and related goodwill impairment charge, the effectiveness of its internal control over financial reporting, and its inventory valuation methodology.  The SEC investigation is still ongoing.

**C.    The Credit Agreement**

43.     On April 22, 2015, Fenix entered into an agreement with BMO Harris Bank N.A., for a proposed $35,000,000 senior secured credit facility (defined previously as the "Credit Facility") that was expressly contingent upon the completion of the IPO.  The Credit Agreement was imperative to Fenix's ability to continue as a going concern as the completion of the IPO was likewise contingent upon the execution of the Credit Facility. Without the Credit Facility, Fenix would not be able to acquire 10 – 15 companies in the next two years (or one to three companies per quarter), or continue as a going concern.

44.     Of the $35,000,000 available under the Credit Facility, $25,000,000 was available as a revolving credit facility, allocated $20,000,000 to us in U.S. Dollars, with a $7,500,000 sublimit for letters of credit, and $5,000,000 in either Canadian Dollars or U.S. Dollars, with a $2,500,000 sublimit for letters of credit. The remaining $10,000,000 was available as a term loan.  So long as there was no default, Fenix could request an increase in the amount of the revolving credit facility by up to an aggregate of $20,000,000.

45.     Fenix stated that proceeds from the Credit Facility would be used for capital expenditures, working capital, permitted acquisitions, general corporate purposes and for certain fees and expenses associated with the closing of the credit facility and the IPO.  The term of the revolving credit facility and the term loan facility was for five years.

46.     The Credit Facility was secured by a first-priority perfected security interest in substantially all of Fenix's and Fenix's domestic subsidiaries assets, specifically inventory.  The value of Fenix's inventory played a large role in Fenix's ability to withdraw under the Credit Facility.  The amount available under the revolver was determined by the amount (if any) by which: (a) the lesser of the U.S. Borrowing Base as then determined and computed or the U.S. Revolving Credit Commitments as then in effect exceeds; (b) the aggregate principal amount of U.S. Revolving Loans, Swing Loans, and U.S. L/C Obligations then outstanding.

47.     The US Borrowing base included: (a) 80% of the then outstanding unpaid amount of Eligible Receivables of the U.S. Loan Parties; plus (b) 50% of the value (computed pursuant to the gross margin retail method of inventory valuation applied in accordance with GAAP, net of amounts for any step-up in basis) of Eligible Inventory of the U.S. Loan Parties; minus (c) the sum of (i) Priority Payables then outstanding in respect of the Eligible Receivables and the Eligible Inventory of the U.S. Loan Parties, (ii) the sum of customer credits and reserves for returns as then established or otherwise maintained by the U.S. Loan Parties on their books and records, and (iii) the amount of reserves imposed from time to time on the U.S. Borrowing Base by Administrative Agent acting in its reasonable discretion.

48.     The Credit Facility also provided that the sum of the aggregate principal amount of U.S. Revolving Loans, Swing Loans, and U.S. L/C Obligations at any time outstanding shall not exceed the lesser of (i) the U.S. Revolving Credit Commitments in effect at such time and (ii) the U.S. Borrowing Base as then determined and computed.

49.     On April 4, 2016, Fenix announced an amendment to the Credit Facility dating back to December 31, 2015.  Under the amendment, Fenix was required to maintain a total leverage ratio of greater than 3.75 to 1 for the first quarter of 2016, 3.50 to 1 for quarters two through four of 2016, 3 to 1 for the first quarter of 2017, and for periods ending on or after June 30, 2017, 2.75 to 1. Further, Fenix was

required to generate positive adjusted Earnings Before Interest, Tax, Depreciation, and Amortization ("EBITDA") in order to increase its draw on its credit facility to consummate acquisitions.

50. The Credit Facility contained customary events of default, including failure to pay any principal, interest or other amount when due, violation of the above affirmative covenants or any negative covenants or a breach of representations and warranties and, in certain circumstances, a change of control. Upon the occurrence of an event of default, payment of the indebtedness would be accelerated, and the lending commitments would be terminated.

51. Throughout the Class Period, Defendants touted the Company's ability to borrow under the Credit Facility. This ability was material to both Fenix and investors because of Fenix's corporate strategy to acquire one to three additional companies *per quarter*, and 10 to 15 additional companies over the first two years of operations. In order to maintain the appearance that Fenix was operating in accordance with its business plan, Fenix continued to mislead investors regarding its inventory valuation and goodwill amount in order to increase its borrowing power under the Credit Facility and stay in compliance with its financial covenants. However, Fenix eventually was forced to disclose its true financial state to the market.

52.     Indeed, Fenix announced on February 21, 2017, that it was in violation of the Credit Facility because of its failure to comply with the Credit Facility's financial covenants due primarily to: (i) ***lower asset values as a result of reductions during 2016 to the aggregate estimated fair value of acquired inventory***, *which* ***reduced the Company's borrowing base***, (ii) ***limits on certain non-cash adjustments*** (including goodwill) to calculate EBITDA for covenant compliance, and (iii) lower than forecasted EBITDA during the third quarter of 2016 because of a decline of approximately 5% in quarterly net revenues (as compared to a Company record level of net revenues for the quarter ended June 30, 2016) and higher operating expenses, ***including significant accounting, legal and other fees primarily as a result of the transition to a new public accounting firm beginning in July 2016 and the previously reported SEC inquiry***.

53.     Fenix disclosed that as a result of this violation of the Credit Facility, substantial doubt existed as to Fenix's ability to continue as a going concern.  In fact, just four months later, Fenix was delisted from NASDAQ.

## THE SECURITIES ACT CLAIMS

54.     These claims, brought under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, are based solely on allegations of negligence, strict liability and/or the absence of any affirmative defense based on the reasonableness of the Section 11 Defendants' investigation of the true facts underlying the alleged

21

misstatements and omissions.  These Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained elsewhere in this Complaint that allege fraud or scienter.  These Securities Act claims are not based on any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance on fraud allegations for the purpose of these claims.

55.    Fenix's IPO occurred on May 15, 2015.  In the IPO, Fenix sold 13,800,000 shares of common stock for a per-share price of $8.00.  At the time of the IPO, all other previously-issued and outstanding registered shares were subject to lock-up agreements and were not freely tradeable on the open market.

56.    Fenix's Registration Statement contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading.  The omissions and misrepresentations within the Registration Statement relate to the internal controls over accounting and calculation of Fenix's inventory and goodwill relating to the Founding Companies.  Fenix also misrepresented its financials relating to inventory and goodwill, and misrepresented its ability to acquire one to three companies per quarter. Notwithstanding this obligation to correctly account for these items and provide accurate information at the time Fenix's Registration Statement became effective, the Section 11 Defendants

failed to provide accurate information in Registration Statement and other documents associated with the IPO (collectively "Offering Documents").

57.     On May 15, 2015, Fenix filed its Registration Statement with the SEC announcing the Company's IPO.  The Registration Statement was signed by the Section 10(b) Defendants.  Fenix reported consolidated inventories of $42,190,000 and goodwill of $58,879,000 as of December 31, 2014.

58.     The above statements about inventory and goodwill were materially false and/or misleading and caused Fenix's stock to become artificially inflated. First, the Registration Statement was false or misleading because it incorrectly stated the fair value of the inventory acquired as part of the purchase of the acquired companies.   Throughout the Class Period, Defendants routinely adjusted the Company's inventory from the acquired companies.  These adjustments resulted in higher goodwill that would eventually lead to a $43.3 million-dollar impairment charge.  As of December 31, 2015 – just seven months after the IPO – Fenix disclosed that goodwill was $73,245,000 and inventory was $38,110,000 from the Founding Companies alone, and as of June 30, 2016, was $83,671,000 for the Acquired Companies.

59.     The incorrect statements of the inventory and goodwill were material to Fenix investors because the real numbers would have reduced the value of the Company, and likely lowered the offering price of the IPO.   Further, Fenix's

inventory and goodwill had a direct effect on Fenix's ability to borrow under the Credit Facility. Had investors known the truth about the internal controls and the true state of inventory and goodwill, it would have altered the total mix of information available to investors when deciding to purchase Fenix stock.

60. The Company also incorrectly described its internal controls in connection with its IPO. Fenix stated in pertinent part:

> In connection with our preparation for this offering, we concluded that there were material weaknesses in our internal control over financial reporting. We did not maintain a sufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements. This caused untimely closing of our books and difficulty in, among other things, reconciling material accounts, recording tax adjustments and relevant tax positions, evaluating necessary valuation information, and assessing related party and other transactions for appropriate accounting treatment. As of December 31, 2014, our financial operations staff consisted only of paid consultants and we had no employees performing accounting functions at this date. The Founding Companies also did not maintain a sufficient complement of resources with an appropriate level of accounting knowledge, experience and training commensurate with the relevant financial reporting requirements.

Registration Statement, at 46.

61. The above statements were materially inaccurate because they failed to inform investors about the Company's weakness in internal controls over "procedures to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, ***contingent consideration, potential goodwill impairment and inventory valuation***." This information was

highly material as Fenix was ultimately forced to significantly write down its inventory and take an impairment charge of $43.3 million.

62.     Finally, the Registration Statement was inaccurate because Fenix told investors that the Company's goal was "to complete between 10 and 15 acquisitions, ranging in size between $5 million and $10 million in revenue, in the near to mid-term following the completion of this offering."

63.     This statement was materially incorrect because Fenix struggled to acquire the Founding Companies without significant complications to the Company's internal controls and false statements in its financial statements. Further, at this time, Fenix had just two employees, consisting of just Robertson and Pettie, and outsourced its entire accounting and management team.  Therefore, at the time of the statements, it was wrong to state that Fenix would be able to acquire 10 to 15 companies in two years without any employees or proper internal controls over its accounting.   In reality, Fenix was only able to acquire three companies within Fenix's first four months, while it struggled to integrate the businesses and timely file its SEC filings.  Due to its improper accounting of inventory and goodwill, and consequential violations of its Credit Facility, Fenix would not be able to acquire any additional companies and would struggle to continue as a going concern.

64.     Additionally, these statements were material because Fenix's main business strategy was to acquire companies.  As stated by BMO Capital Markets,

the underwriter of the IPO, in its initiating coverage report dated June 8, 2015, "[Fenix] also expects to persistently add to its network through acquisitions (targeting 10-15 in the next 2-3 years). . . . In our view, this strategy is highly dependent on management's ability to execute the building of business as well as finding reasonably priced acquisitions and integrating them . . . ."

65.    The Section 11 Defendants failed to properly investigate and/or perform due diligence with regard to the above statements about Fenix's internal controls, its valuation of inventory and goodwill, and its ability to acquire additional companies.  The Section 11 Defendants' misrepresentations materially influenced investors to purchase Fenix stock, as the incorrect numbers led investors to inaccurately believe that Fenix was in a better financial position than they truly were.

66.    With proper due diligence, the Section 11 Defendants would have been able to discover the aforementioned weaknesses in internal controls, errors with regard to the Company's valuation of inventory and goodwill, and false statements regarding future acquisitions.  Such due diligence would have either prevented the misrepresentations from occurring.  But for the Section 11 Defendants' failure to exercise proper and reasonable care in ensuring the accuracy and truthfulness of the Registration Statement, Plaintiffs and the investors they represent would not have been injured.  The Section 11 Defendants acted with negligence in connection with

their duties relating to the Registration Statement and/or are strictly liable for the misrepresentations.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Fenix's securities during the Class Period (the "Class") and were damaged upon the revelation of the truth.  Excluded from the Class are Defendants herein; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fenix's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fenix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The number of outstanding shares of the registrant's common stock as

of July 20, 2017 was 20,327,685. As of June 30, 2016, the aggregate market value of common stock outstanding held by stockholders who were not affiliates of the registrant was approximately $64 million. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

69.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

71.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Fenix;

(c)     whether Defendants caused Fenix to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements with respect to Plaintiffs' Exchange Act Claims;

(e)     whether the prices of Fenix's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 11 of the Securities Act
### against the Section 11 Defendants

73.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein. Notwithstanding anything to the contrary alleged herein, for the purposes

of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

74.     As set forth above, Fenix's Registration Statement contained untrue statements of material fact and omitted material facts required to be stated in order to make the statements contained therein not misleading.

75.     Fenix's Registration Statement was signed by the Section 11 Defendants.

76.     The Section 11 Defendants were directors of or partners in Fenix at the time of the filing of the Registration Statement.

77.     The Section 11 Defendants were named in the Registration statement as being or about to become a director of, or person performing similar functions in, Fenix.

78.     BMO Capital Markets, Stifel Nicolaus, BB&T, and Barrington acted as the representatives for the underwriters with respect to the Fenix common stock offered in the IPO.

79.     Plaintiffs and the other members of the Class purchased Fenix common stock in the IPO.

80.     Plaintiffs and the other members of the Class were damaged by the Section 11 Defendants as a direct and proximate result of the untrue statements and omissions in the Registration Statement.

81.     This claim was brought within the applicable statute of limitations.

82.     By reason of the foregoing, the Section 11 Defendants have violated

Section 11 of the Securities Act and are liable to Plaintiffs and the other members of the Class.

## COUNT II

### Violation of Section 15 of the Securities Act
### against the Section 15 Defendants

83.     Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.  Notwithstanding anything to the contrary, for the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

84.     Each of the Section 15 Defendants participated in the operation and management of Fenix at the time of the IPO and conducted and participated, directly and indirectly, in the conduct of Fenix's business affairs.

85.     Each of the Section 15 Defendants was involved in the day-to-day operations of the Company at the highest levels.

86.     Each of the Section 15 Defendants was privy to confidential proprietary information concerning the Company and its business and operations.

87.     The Section 15 Defendants were senior officers and directors of Fenix. Due to their positions of control and authority, the Section 15 Defendants were able to, and did, control the contents of the Registration Statement that contained materially false and inaccurate information.

88.     The Section 15 Defendants each signed, or caused to be signed on their

31

behalf, the Registration Statement.

89.     The Section 15 Defendants were controlling persons of Fenix under the Securities Act.

90.     Fenix's conduct, as alleged herein, constitutes a violation of Section 11 of the Securities Act.

91.     The Section 15 Defendants are liable to Plaintiffs and the other members of the Class, jointly and severally with and to the same extent as Fenix, for violations under Section 15 of the Securities Act.

## THE EXCHANGE ACT CLAIMS

92.     Separate and apart from the Securities Act claims, Plaintiffs' Exchange Act claims seek to hold the Section 10(b) Defendants and Section 20(a) Defendants liable for intentionally (or with deliberate recklessness) issuing false and misleading statements for the purpose of inducing investors to purchase Fenix stock and/or perpetrating a fraudulent scheme or device upon Plaintiffs and other members of the Class.

93.     Unlike Plaintiffs' Securities Act claims, Plaintiffs' claims under the Exchange Act sound in fraud.  Defendants' deception began with the Company's IPO. In order to generate interest in the IPO and gain financially, Defendants Kent Robertson ("Robertson") and Scott Pettit ("Pettit"), unbeknownst to the general investing public, made material misrepresentations and/or omissions to artificially

32

inflate Fenix's IPO price of $8.00 per share.  Defendants Robertson and Pettit misrepresented Fenix's consolidated financials, specifically inventory valuation and goodwill, and told investors that it would be able to acquire 10-15 additional companies within two years.  Defendants told investors this would be possible because it had a $55 million credit facility from BMO Harris Bank N.A. (the "Credit Facility").

94.    However, Defendants withheld the fact that in under a year, Fenix would have to discount inventory by $14 million resulting in an inflation of goodwill of over $24 million.  These adjustments would ultimately result in the resignation of Fenix's auditor, a $45.3 million goodwill impairment charge, and the violation of material terms of the Credit Facility.  The SEC is currently conducting an investigation as to the departure of Fenix's auditor, the lack of internal controls over inventory valuation and accounting, and the subsequent violation of the Credit Facility.  Further, as a result of Fenix's violation of the Credit Agreement, Fenix announced a substantial doubt in its ability to continue as a going concern and was ultimately delisted from NASDAQ.

95.    Defendants' fraud (in the case of the Exchange Act claims) ran rampant throughout the Company's existence, which spanned just above two years between its IPO and its delisting in June 2017.  Defendants failed to comply with their disclosure obligations as well as intentionally misled investors so as to benefit

33

financially for their own personal gain.  The concrete personal benefits enjoyed by Defendants, along with the clear allegations of actual knowledge of wrongdoing, gives rise to a strong, cogent and compelling inference of scienter.

## A.  Defendants' Materially False and Misleading Statements

### *May 15, 2015 – Prospectus*

For the reasons set forth above in connection with Plaintiffs' Securities Act claims, the statements contained within the Company's Offering Documents issued in connection with Fenix's IPO were materially false and misleading.

### *June 29, 2015 – Quarterly Report*

96.    On June 29, 2015, after the market closed, Fenix filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 Form 10-Q"). Defendants Robertson and Pettit signed the quarterly report on behalf of the Company.

97.    Fenix did not provide full financials, but informed investors that "Based on a preliminary estimate of the net assets acquired/assumed, the Company expect[ed] to record goodwill ranging from $50 million to $65 million . . . ." Q1 2015 Form 10-Q, at 10. Fenix also reiterated its inventory and goodwill accounting policies from the Registration Statement.

98.    The above statements about inventory and goodwill were materially false and/or misleading and caused Fenix's stock to become artificially inflated. First, the statement was false or misleading because it misrepresented the fair value of the inventory acquired as part of the purchase of the Founding Companies. Throughout the Class Period, Defendants routinely adjusted the Company's inventory from the Founding Companies.  As of December 31, 2015, just seven months after the IPO, Fenix disclosed that goodwill was $73,245,000 and inventory was $38,110,000 from the Founding Companies alone, and as of June 30, 2016, was $83,671,000 for the Acquired Companies.  These adjustments eventually lead to a $43.3 million dollar goodwill impairment charge.

99.    The Company also misrepresented its internal controls. Fenix stated in pertinent part:

> We have evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2015, the end of the period covered by this report on Form 10-Q. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective because of material weaknesses in our internal control over financial reporting. These material weaknesses were attributable to the Company's and the Founding Companies' lack of accounting personnel with an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements, as previously disclosed in our final prospectus dated May 14, 2015 (the "Final Prospectus") included in our Registration Statement on Form S-1 filed on April 8, 2015 and declared effective on May 13, 2015 (Registration No. 333-203296) (the "Registration Statement").

Q1 2015 Form 10-Q, at 44.

100.   The above statements were materially misleading because they failed to inform investors over the weakness in internal controls over "procedures to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, **contingent consideration, potential goodwill impairment and inventory valuation**."

101.   The misrepresentations and omissions relating to the internal controls of Fenix and the improper recording of inventory and goodwill were material to Fenix investors because the real numbers would have reduced the value of the Company and likely lowered the offering price of the IPO.  This information was highly material as Fenix was ultimately forced to take an impairment charge of $43.3 million, violated its Credit Facility, and struggled to continue as a going concern.

102.   The Q1 2015 Form 10-Q was also materially misleading given that it included certifications by Robertson and Pettit pursuant to the Sarbanes-Oxley Act ("SOX").  These certifications indicated that Robertson and Pettit had both reviewed the Q1 2015 Form 10-Q and that it was materially accurate and not misleading. Specifically, Robertson and Pettit each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2015 of Fenix Parts, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the**

36

**circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q1 2015 Form 10-Q, Exs. 31.1 & 31.2.)

103.   Given the false and misleading nature of the statements in the Q1 2015 Form 10-Q described above, Robertson's and Pettit's certifications were false and/or materially misleading.  These omissions and misrepresentations were material to Fenix's investors because investors would have declined to purchase Fenix's stock had they known that the Q1 2015 Form 10-Q contained material misrepresentations and/or omissions.

<u>*June 30, 2015 – Earnings Call*</u>

104.   On June 30, 2015, during market trading hours, Fenix held a call to discuss Q1 2015 Earnings. Robertson and Pettit discussed the Company's results. During the call Robertson and Pettit informed investors it had an acquisition pipeline of over $100 million in annual revenue and Pettit told investors that Fenix "expect[s] to close on average an average of one to three acquisitions per quarter beginning in the second half of this year."

105.   This statement was false and misleading because although Defendants would be able to meet this goal in the short term, Defendants knew there was no way the Company could meet this goal long-term due to its inflated balance sheet and improper accounting for goodwill and inventory. As CW1 indicated, Fenix could hardly consolidate the eight original companies. At the time of the statements, Defendants knew that their financials were off and that they would struggle to integrate the original business, but still misled investors into believing that they would be able to acquire and consolidate an additional one to three acquisitions *per quarter*.  In reality, Fenix was only able to acquire three companies within Fenix's first four months while it struggled to integrate the businesses and timely file its SEC filings.  However, due to its improper accounting of inventory and goodwill, and consequential violations of its Credit Facility, Fenix would not be able to acquire any additional companies and would struggle to continue as a going concern.

106.   These statements were also material as investors relied on Defendants' corporate strategy to acquire additional businesses.  For example, in a research report by Barrington Research dated July 10, 2015, Barrington stated that "We are initiating research coverage of FENX with an OUTPERFORM investment rating and an initial two-year price target of $15 **based on our belief in the successful execution of an acquisition growth strategy** . . . ."  One of Barrington's sole reason for the high

price target was due to acquisitions.   Therefore, this information was material to investors.

<u>*August 4, 2015 – Form 8-K/A*</u>

107.   On August 4, 2015, Fenix filed a Form 8-K/A with the SEC and attached as Exhibit 99.2 Fenix's unaudited pro forma financial statements as of March 31, 2015. On the financial statements, Fenix reported inventory of $42,005,000 and goodwill of $57,309,000 for the Founding Companies.

108.   The above statements about inventory and goodwill were materially false and misleading and caused Fenix's stock to become artificially inflated. First, the Registration Statement was false or misleading because it misrepresented the fair value of the inventory acquired as part of the purchase of the Founding Companies. Throughout the Class Period, Defendants routinely adjusted its inventory from the Founding Companies.  As of December 31, 2015, just seven months after the IPO, Fenix disclosed that goodwill was $73,245,000 and inventory was $38,110,000 from the Founding Companies alone, and as of June 30, 2016, was $83,671,000 for the Acquired Companies. These adjustments eventually lead to a $43.3 million dollar goodwill impairment charge, violation of Fenix's Credit Facility, and impaired on Fenix's ability to continue as a going concern.

109.   The omissions and misrepresentations of the inventory and goodwill were material to Fenix investors because the real numbers would have reduced the

value of Fenix's stock price.  Further, had the correct inventory and goodwill been

disclosed, Fenix would have taken a lower impairment charge sooner, and Fenix

could have taken the appropriate steps to avoid violating the covenants in the Credit

Facility.  This information would have altered the total mix of information available

to investors when deciding to purchase Fenix stock.

*August 5, 2015 – Earnings Call*

110.   On August 5, 2015, Fenix held an earnings call to discuss the financials

it released on August 4, 2015, and to disclose that it would be unable to timely file

its Q2 2015 financial results.  Robertson stated in pertinent part:

> And we are also refining the diligence and integration process for
> further acquisitions -- or for future acquisitions, insuring a disciplined
> and efficient approach. . . . The pipeline of companies meeting our
> acquisition criteria now represents more than $150 million of annual
> revenue. That's a substantial increase since our last investor call. There
> is significant interest in joining Fenix, and much progress has been
> made, as we now have several LOIs in process. **We remain confident
> that we are in a position to close an average of 1 to 3 acquisitions
> per quarter, starting in the third quarter.**

111.   In response to an analyst's question about the $150 million of

acquisition pipeline, Robertson stated:

> Yes, Richard, this is Kent. So the pipeline that we talked about on the
> last call -- these new companies are in that same -- meet the same
> criteria that are really along the Eastern seaboard; they either plug into
> our hub or in adjacent markets. They are all kind of in that same $5 to
> $10 million range. And the reason the pipeline has grown really comes
> from the fact that our M&A team is now actively talking to folks --
> proactively talking to folks. And as we get further through those
> conversations, we get their financials, **and we feel like the**

41

**conversations may ultimately lead to a deal**, that's when we bring them into the pipeline.

112.   The above statements in bold were false and misleading because although Defendants knew they would be able to meet this in the short term, Defendants knew there was no way they could meet this long-term due to their inflated balance sheet and improper accounting for goodwill and inventory.  As CW1 indicated, Fenix was having trouble consolidating the eight original companies as there was substantial disagreement between Fenix and the Auditors regarding how to account for inventory.

113.   At the time of the statements, Defendants knew that the Company's financial statements relating to inventory and goodwill were false and misleading and that the Company lacked internal controls, but still misled investors into believing that Fenix would be able to acquire and consolidate an additional one to three acquisitions *per quarter*.  In reality, Fenix was only able to acquire three companies within Fenix's first four months while it struggled to integrate the businesses and timely file its SEC filings.  However, due to its improper accounting of inventory and goodwill, and consequential violations of its Credit Facility, Fenix would not be able to acquire any additional companies and would struggle to continue as a going concern.

114.   As stated above, these statements were also material as investors and analysts relied on Defendants' corporate strategy and business plan to acquire 10 –

15 companies within two years of the IPO in deciding to acquire Fenix stock.  Had

investors known the truth about Fenix's inability to account for its acquisition's

inventory and goodwill, and the effect it would have on future acquisitions, investors

would not have purchased Fenix securities.

*August 18, 2015 – Press Release*

115.   On August 18, 2015, Fenix filed a Form 8-K with the SEC and Press

Release on Globe Newswire announcing that it would be further delaying its Q2

2015 filing until September 2, 2015, and announcing the acquisition of Ocean

County Auto Wreckers, Inc. The Press Release stated in pertinent part:

> Fenix Parts, Inc. (Nasdaq:FENX), a leading recycler and reseller of
> original equipment manufacturer ("OEM") automotive products, today
> announced the acquisition of Ocean County Auto Wreckers, Inc.
> ("Ocean County") in Bayville, New Jersey. Founded in 1959, Ocean
> County is a full-service auto recycling facility and represents Fenix
> Parts' second location in New Jersey. For the 12 months ended June 30,
> 2015, Ocean County had revenues of approximately $8.0 million.
>
> Kent Robertson, CEO of Fenix Parts, said, "We are pleased to announce
> our first acquisition since our IPO and related combination in May as
> we welcome the Ocean County team to Fenix Parts. Ocean County is a
> high-quality auto recycler that meets all of our acquisition criteria, with
> strong leadership and operations adjacent to our existing markets that
> will expand our distribution, dismantling, warehouse and yard
> capacity."
>
> Robertson continued, "With the addition of Ocean County, we now
> have 14 facilities located primarily in the northeastern U.S. and Canada,
> allowing Fenix to provide customers access to a larger, more diverse
> inventory and better product availability. **We look forward to**

**announcing future acquisitions as we continue to execute our expansion strategy**."

116.   The statement in bold is materially false and/or misleading because it fails to provide investors with material information regarding its acquisition.  First, as evident by the concurrent announcement of further delay in its Q2 2015 filing, Fenix was having significant issues accounting for the Founding Companies, specifically the inventory and goodwill.  However, Fenix assured investors that it would continue with the Company's expansion strategy despite knowing that it lacked internal controls over their accounting and that this would potentially materially impact the Company's borrowing capabilities under the Credit Facility.

117.   As stated above, these statements were also material as investors and analysts relied on Defendants' corporate strategy and business plan to acquire 10 – 15 businesses within two years of the IPO and one to three businesses per quarter in deciding to acquire Fenix stock.  Had investors known the truth about Fenix's inability to account for its acquisition's inventory and goodwill, and the effect it would have on future acquisitions, investors would not have purchased Fenix securities.

### *September 3, 2015 – Earnings Call*

118.   Despite not having filed its Q2 2015 Form 10-Q, Fenix held an earnings call on September 3, 2015 to discuss its Q2 2015 results.  Robertson and Pettit were on the call.  Robertson stated in pertinent part:

Moving onto another key area, **we are committed to driving growth by expanding the business through acquisition**. . . . As we discussed on our last call a few weeks ago, the pipeline of companies meeting our acquisition criteria now represents more than $150 million of annual revenue. Interest in Fenix Parts remains strong **and we are confident that we will close an average of one to three acquisitions per quarter.**

*       *       *

With regard to the pipeline, we had originally outlined a $100 million pipeline. As we began contacting folks and working through really outbound discussions, that pipeline has grown significantly. It really is lined up with our core area of focus, which is up and down the East Coast, kind of Canada to Florida. They either, again, plug into one our existing hubs or expand our market in that general area. The profile of those companies    are kind of in that $5 million to $10 million range, as we've talked about before. So really the growth from the $100 million to $150 million is just us doing more outbound proactive conversations, and the quality of those companies come in across the goal as far as folks that we feel with some degree of certainty that they would be a good fit and a logical step.

119.   Pettit also discussed the accounting issues and the attempts Fenix was

making to consolidate the companies.  Pettit stated in pertinent part:

As you know, we spend a lot of time, effort and expense to get three major filings completed over the past couple of months in the required SEC filing formats. **We understand** that the first quarter 10-Q and the subsequent 8-K(a), along with the second-quarter 10-Q **does not provide the level of information desired by our investors and analysts**. In order to get to that next level of information and to streamline the consolidation of our financial reporting environment, we have acquired and have now installed an enterprise-wide financial reporting package. We are in the process of transitioning all of the Founding Companies' historical information on to that new platform. We have already installed Microsoft Dynamics GP using Fenix Parts as a starting point and have transitioned one of the Founding Companies already onto that platform. Between now and November, we will have moved all of the companies on to our consolidated reporting platform and will be well into our 2016 planning process. The enhanced

consolidated reporting will provide a level of detail that is more appropriate for our management team to gain insight into and run our business. This will also allow us to give you more insight and guidance into expectations for the fourth quarter and 2016 fiscal year. This includes adjusted EBITDA and more detail on revenue, cost of goods sold, and operating expenses. We look forward to being able to update that information to you in November.

120.   The above statements about acquisitions are materially false or misleading because Fenix did not have the internal controls or accounting to continue to acquire one to three businesses per quarter.  In fact, Fenix was struggling to integrate the original eight companies. As shown above, Fenix was just able to acquire a financial reporting package and has only been able to put one of the eight acquired companies onto that package.  Further, Defendants' statements that "they understand" that they are not giving information, shows that they were well aware of the problems with their internal controls and the effects this would have on Fenix. The truth is that Fenix was improperly accounting for inventory and goodwill and, as a result, would violate material terms of the Credit Facility.  These violations resulted in the inability to acquire additional companies and eventually lead to Fenix's inability to continue as a going concern.

121.   As stated above, Fenix's continual touting of its acquisition capability was material to investors.  One of Fenix's main strategies for growth was to acquire companies.  As a result analysts and investors relied heavily on these statements by Robertson and Pettit.

46

*September 14, 2015 – Form 10-Q*

122.   On September 14, 2015, after the market closed, Fenix finally filed with the SEC its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 Form 10-Q"). Robertson and Pettit signed the Q2 2015 Form 10-Q on behalf of the Company.

123.   The Q2 2015 Form 10-Q reported inventories from the acquired companies of $39,020,905 and goodwill of $69,797,910 as of June 30, 2015.  Q2 2015 Form 10-Q, at 5. The Q2 2015 Form 10-Q also disclosed that its goodwill "as of the acquisition date" was $70,435,000.  Q2 2015 Form 10-Q, at 18.

124.   Fenix also announced that "The Company has elected to perform its annual evaluation of impairment as of December 31." Fenix stated that there "were no impairment charges related to goodwill during the post-Combination period ended June 30, 2015."  Q2 2015 Form 10-Q, at 12.  Fenix further stated that "There have been no indicators of impairment during 2015."  *Id*. at 13.

125.   The above statements about inventory and goodwill were materially false and misleading and caused Fenix's stock to become artificially inflated.  First, the statements relating to the value of inventory and goodwill were false and/or misleading because Fenix misrepresented the fair value of the inventory acquired as part of the purchase of the Founding Companies.  Throughout the Class Period,

Defendants routinely adjusted its inventory from the Founding Companies. These adjustments resulted in higher goodwill that would eventually lead to a $43.3 million-dollar impairment charge. As of December 31, 2015, just seven months after the IPO, partially because of the adjustments, Fenix disclosed that goodwill was $73,245,000 and inventory was $38,110,000 from the Founding Companies.

126.   Further, the statements were misleading because Fenix failed to inform investors that it did not have the proper internal controls to determine whether it needed to perform an impairment charge. Indeed, the Company's lack of internal controls resulted in a deflated goodwill amount. Had Fenix properly accounted for inventory, goodwill would have been higher and Fenix would have taken an impairment charge earlier.

127.   The omissions and misrepresentations related to the inventory and goodwill were material to Fenix investors because the real numbers would have reduced the value of the Company and lowered the stock price as was shown when the truth was revealed. Therefore, this would have altered the total mix of information available to investors when deciding to purchase Fenix stock.

128.   The Company also misrepresented its internal controls. Fenix stated in pertinent part:

> We have evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2015, the end of the period covered by this report on Form 10-Q. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's

disclosure controls and procedures were not effective because of material weaknesses in our internal control over financial reporting. These material weaknesses were attributable to the Company's and the Founding Companies' lack of accounting personnel with an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements, as previously disclosed in our final prospectus dated May 14, 2015 (the "Final Prospectus") included in our Registration Statement on Form S-1 filed on April 8, 2015 and declared effective on May 13, 2015 (Registration No. 333-203296) (the "Registration Statement") and in our previously filed Form 10-Q for the period ended March 31, 2015.

Q2 2015 Form 10-Q, at 56.

129.   The above statements were materially misleading because they failed to inform investors over the weakness in internal controls over "procedures to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, contingent consideration, ***potential goodwill impairment and inventory valuation***." This information was highly material as Fenix was ultimately forced to take an impairment charge of $43.3 million, and a reduction in inventory valuation, resulting in a breach of the Credit Facility.

130.   The Q2 2015 Form 10-Q was also materially misleading given that it included certifications by Robertson and Pettit pursuant to SOX. These certifications indicated that Robertson and Pettit had both reviewed the Q2 2015 Form 10-Q and that it was materially accurate and not misleading. Specifically, Robertson and Pettit each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2015 of Fenix Parts, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q2 2015 Form 10-Q, Exs. 31.1 & 31.2.)

131.   Given the false and misleading nature of the statements in the Q2 2015 Form 10-Q described above, Robertson's and Pettit's certifications were false and/or materially misleading. These omissions and misrepresentations were material to Fenix's investors because investors would have declined to purchase Fenix's stock had they known that the Q2 2015 Form 10-Q contained material misrepresentations and/or omissions.

<u>*September 25, 2015 – Investor Presentation*</u>

132.   On September 25, 2015, after hours, Fenix filed with the SEC a Form 8-K attaching its investor presentation. The investor presentation touted its "Robust Pipeline for Future Acquisitions" and stated that it had "16+ acquisition candidates under NDA."

51

133.   At the time of the statements, Defendants knew that their financials relating to inventory and goodwill were false and misleading, and that they lacked internal controls, but still misled investors into believing that they would be able to acquire and consolidate an additional one to three acquisitions per quarter.  In reality, Fenix was only able to acquire three companies within Fenix's first four months while it struggled to integrate the businesses and timely file its SEC filings. However, due to its improper accounting of inventory and goodwill, and consequential violations of its Credit Facility, Fenix would not be able to acquire any additional companies and would struggle to continue as a going concern.

134.   As stated above, these statements were also material as investors and analysts relied on Defendants' corporate strategy of future acquisitions in deciding to acquire Fenix stock.  Had investors known the truth about Fenix's inability to account for its acquisition's inventory and goodwill, and the effect it would have on future acquisitions, investors would not have purchased Fenix securities.

*October 7, 2015 – Press Release*

135.   On October 7, 2015, Fenix issued a Press Release announcing the acquisition of Butler Auto Sales, the second acquisition since the IPO. The Press Release stated in pertinent part:

> Fenix Parts, Inc. (Nasdaq:FENX), a leading recycler and reseller of original equipment manufacturer ("OEM") automotive products, today announced the acquisition of Butler Auto Sales and Parts, Inc. ("Butler") in Forest City, North Carolina for $8.3 million in cash and

52

106,918 shares of Fenix common stock. The cash portion of the purchase price was financed through a combination of cash on hand **and utilization of $2.2 million of the Company's credit facility.** Butler is a full-service auto recycling facility servicing Charlotte and the surrounding markets and represents Fenix Parts' first location in North Carolina. For the 12 months ended July 31, 2015, Butler had revenues of approximately $9 million.

Kent Robertson, CEO of Fenix Parts, said, "We are excited to announce the acquisition of Butler Auto Sales and Parts, Inc., which represents our second acquisition since our IPO in May. Founded 25 years ago, Butler specializes in acquiring and selling high-quality late model used automobile parts for both domestic and foreign models, which should help to diversify our overall inventory and provide our customers with greater product availability."

Robertson continued, "Butler is a highly respected, full-service automobile recycler with an experienced leadership team. As our first location in North Carolina, Butler fits perfectly into our growing East Coast footprint by filling a key position between our Jacksonville, Florida and Northeastern U.S. locations. With the addition of Butler, we now have 15 strategically located facilities throughout the East Coast. We are delighted to welcome the Butler team to the Fenix Parts family."

136.   The above statement about the acquisition of Butler was false and misleading because Defendants failed to inform investors that it was improperly accounting for the acquired companies' inventories. This statement was material because as Fenix later disclosed, Fenix had to lower asset values to the aggregate estimated fair value of acquired inventory.  This directly led to a violation of the Credit Facility's financial covenants because of the reduction in the Credit Facility's

borrowing base.  Consequentially, Fenix was severely limited in its acquisition power because it could no longer borrow under the Credit Facility.

137.   The statements were also misleading because due to the true nature of the Company's financials, Fenix actually had substantially less capacity to borrow under the Credit Facility.  Therefore, although Fenix indicated only $2.2 million was taken out on the Credit Facility, Fenix misled investors about the capacity of the Credit Facility and its ability to acquire future businesses.

<u>*October 9, 2015 – Press Release*</u>

138.   On October 9, 2015, Fenix issued a Press Release announcing the acquisition of Tri-City Auto Salvage, Inc., the third acquisition since their IPO. The Press Release stated in pertinent part:

> Fenix Parts, Inc. (Nasdaq:FENX), a leading recycler and reseller of original equipment manufacturer ("OEM") automotive products, today announced the acquisition of Tri-City Auto Salvage, Inc. ("Tri-City") in Greensboro, North Carolina for approximately $6.6 million in cash and 42,363 shares of Fenix common stock. The cash portion of the purchase price was financed through a combination of cash on hand **and utilization of $6.5 million of the Company's credit facility.** Tri-City is a full-service automotive recycling facility servicing Greensboro and the surrounding markets and represents Fenix Parts' second location in North Carolina. For the 12 months ended June 30, 2015, Tri-City had revenues of approximately $8 million.
>
> Kent Robertson, CEO of Fenix Parts, said, "We are pleased to announce the acquisition of Tri-City Auto Salvage, which has been doing business in central North Carolina – which includes the Greensboro, Charlotte, Raleigh-Durham and surrounding areas – for the past 21 years. Led by an experienced and highly respected management team,

Tri-City offers a broad selection of used parts for both domestic and foreign model vehicles. In-line with our strategy, it will provide our customers access to a larger and more diversified inventory of parts while also expanding our distribution, dismantling, warehouse and yard capacity. We are excited by the opportunities Tri-City will bring to Fenix Parts' customers and shareholders."

Robertson continued, "Tri-City builds off of our recent acquisition of Butler Auto Sales and Parts in Forest City, NC, establishing Fenix as a leader in the state's strong automotive recycling industry. In addition, with 16 facilities strategically located throughout the East Coast and a strong pipeline of acquisition candidates, **Fenix Parts remains well positioned to execute our long-term growth strategy**."

139.   The above statement about the acquisition of Butler was false and misleading because Defendants failed to inform investors that it was improperly accounting for the acquired companies' inventories.  This statement was material because as Fenix later disclosed, Fenix had to lower asset values to the aggregate estimated fair value of acquired inventory.  This directly led to a violation of the Credit Facility's financial covenants because of the reduction in the Credit Facility's borrowing base.  Consequentially, Fenix was severely limited in its acquisition power because it could no longer borrow under the Credit Facility.

140.   The statements were also misleading because due to the true nature of the Company's financials, Fenix actually had substantially less capacity to borrow under the Credit Facility.  Therefore, although Fenix indicated only $6.5 million was taken out on the Credit Facility, Fenix mislead investors about the capacity of the Credit Facility and its ability to acquire future businesses.  In reality, this would be

the last of Fenix's acquisitions and the Company would eventually be delisted from NASDAQ on June 29, 2017.

*November 12, 2015 – Investor Presentation*

141.   On November 12, 2015, after hours, Fenix filed with the SEC a Form 8-K attaching its investor presentation.  The investor presentation touted its "Robust Pipeline for Future Acquisitions" and stated that it had a near to mid-term acquisition pipeline of 19 companies.  The investor presentation also disclosed that it had a $55 million BMO credit facility with a $9.8 million term loan and only $8.7 million drawn against the credit facility.

142.   This statement was materially false or misleading because due to Fenix's improper accounting, lack of internal controls, and the amount withdrawn on previous acquisitions, Fenix was actually in violation of many financial terms of the Credit Facility and was incapable of additional borrowings.  Therefore, the above statements misled investors to believe that additional acquisitions were not only possible but imminent.  To date, Fenix has not made a single additional acquisition and is still in breach of the Credit Facility.

**B.    The Truth Emerges Through Partial Disclosures While Defendants Continue to Issue False Assurances**

*November 16, 2015 – Form 10-Q*

143.   On November 16, 2015, after the market closed, Fenix filed with the SEC its quarterly report on Form 10-Q with the SEC announcing the Company's

financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 Form 10-Q"). Robertson and Pettit signed the Q3 2015 Form 10-Q on behalf of the Company.

144.   On the Form 10-Q, Fenix partially disclosed the problems it was having accounting for inventory value.  For example, the Company stated in pertinent part:

> Our cost of goods sold in the initial months after a business acquisition, such as the Founding Companies and Ocean County, reflects the increased valuation of acquired inventory, which has the impact of temporarily reducing our gross margin. During the three and nine month periods ended September 30, 2015, the amortization of this fair value adjustment to inventory increased cost of goods sold for Fenix Parts by $4.3 million and $7.3 million, respectively.

Q3 2015 Form 10-Q, at 48.

145.   This revelation partially revealed that Fenix was improperly recorded inventory value and was forced to adjust its inventory by $4.3 million and $7.3 million for the three- and nine-month periods ended September 30, 2015.  Analysts paid specific attention to this adjustment.  For example, BMO Capital Markets, one of the underwriters for the IPO, stated on an analyst report dated November 17, 2015 that "3Q results were affected by amortization of acquired inventory (-$4.2 million or -$0.13 per share) and professional service fees and other public company costs before management had the consolidated reporting platform in place to drive material cost savings." Accordingly, investors and analysts paid attention to this announcement and believed this to be material.

146.   On this news, shares of Fenix decreased from $6.11 per share at close on November 16, 2015 to a low of $5.40 on November 17, 2015, a drop of 11.6%, on unusually heavy volume.

147.   The Q3 2015 Form 10-Q also continued to mislead investors. Specifically, Fenix announced that as of September 30, 2015, goodwill consisted of $70,995,317 and inventory consisted of $35,157,934. Fenix also stated that goodwill from the original acquisitions as of May 18, 2015 was actually $70,810,000.  Despite the huge increase in goodwill since the IPO and 16.5% drop in stock price (calculated as of October 1, 2015), the Company stated that "[t]here were no impairment charges related to goodwill during the post-Combination period ended September 30, 2015."

148.   This statement was materially false and misleading because as Fenix would be forced to make even more adjustments to inventory which would lead to an even bigger increase in goodwill.  Fenix misrepresented the fair value of the inventory acquired as part of the purchase of the Founding Companies.  Throughout the Class Period, Defendants routinely adjusted its inventory from the Founding Companies.  As of December 31, 2015, just seven months after the IPO, Fenix disclosed that goodwill was $73,245,000 and inventory was $38,110,000 from the Founding Companies alone, and as of June 30, 2016, was $83,671,000 for the Acquired Companies.  These adjustments eventually lead to a $43.3 million-dollar

goodwill impairment charge.  As a result of these misrepresentations, Fenix hid from investors the true state of its ability to acquire companies and continue as a going concern.

149.   The Q3 2015 Form 10-Q's disclosures of its weakness over internal controls was also misleading.  The Company stated:

> We have evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2015, the end of the period covered by this report on Form 10-Q. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective because of material weaknesses in our internal control over financial reporting. These material weaknesses were attributable to the Company's and the Founding Companies' lack of accounting personnel with an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements, as previously disclosed in our final prospectus dated May 14, 2015 (the "Final Prospectus") included in our Registration Statement on Form S-1 filed on April 8, 2015 and declared effective on May 13, 2015 (Registration No. 333-203296) (the "Registration Statement") and in our previously filed quarterly reports on Form 10-Q for the periods ended March 31, 2015 and June 30, 2015.

Q3 2015 Form 10-Q, at 58.

150.   The above statements were materially misleading because they failed to inform investors over the weakness in internal controls over "procedures to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, *contingent consideration, potential goodwill impairment and inventory valuation*."   This information was highly

material as Fenix was forced to take an impairment charge of $43.3 million and decrease its inventory, resulting in a violation of the Credit Facility.

151.   Finally, the Q3 2015 Form 10-Q was materially misleading given that it included certifications by Robertson and Pettit pursuant to SOX. These certifications indicated that Robertson and Pettit had both reviewed the Q3 2015 Form 10-Q and that it was materially accurate and not misleading. Specifically, Robertson and Pettit each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2015 of Fenix Parts, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q3 2015 Form 10-Q, Exs. 31.1 & 31.2.)

152.   Given the false and misleading nature of the statements in the Q3 2015 Form 10-Q described above, Robertson's and Pettit's certifications were false and materially misleading.  These omissions and misrepresentations were material to Fenix's investors because investors would have declined to purchase Fenix's stock

had they known that the Q3 2015 Form 10-Q contained material misrepresentations and/or omissions.

<u>*November 17, 2015 – Earnings Call*</u>

153.   In connection with the Q3 2015 Form 10-Q, Fenix held an earnings call on November 17, 2015 to discuss its Q3 2015 financial results.  Robertson and Pettit participated on the call.  Robertson discussed the recent acquisitions and stated in pertinent part:

> **Our second area of focus is through growth through acquisition.** As a reminder, there are significant benefits of scale to our business, which make acquisitions extremely attractive. These benefits include increased parts availability through the hub; synergies relating to how we buy cars, tow, and distribute our parts to our customers; and the resulting leverage we gain on our fixed cost structure and corporate general and administrative expenses.
>
> \*      \*      \*
>
> In October, we made two additional acquisitions, providing us with momentum on the expansion front, both of these in the state of North Carolina. Butler Auto Sales and Parts is a full-service auto recycling facility located in Forest City, North Carolina, and serves the Charlotte and surrounding markets. It represented Fenix Parts' first location in North Carolina.
>
> For the 12 months ended July 31, 2015, Butler had revenues of approximately $9 million. Butler focused on high-quality, late-model vehicles; and, because of their yard capacity, they tend to hold the vehicles longer and sell more parts, yielding higher profit margins. We acquired Butler for $8.3 million in cash and just over 100,000 shares of Fenix common stock. The cash portion of the purchase price was financed through a combination of cash on hand **and utilization of $2.2 million of the Company's credit facility.**
>
> Two days later, we announced the acquisition of Tri-City Auto Salvage, which is a full-service automotive recycling facility servicing

Greensboro and the surrounding markets. For the 12 months ended June 30, 2015, Tri-City had revenues of approximately $8 million. We acquired Tri-City for approximately $6.6 million in cash and roughly 42,000 shares of Fenix common stock. The cash portion of the purchase price was financed through a combination of cash on hand **and the utilization of $6.5 million of the Company's credit facility.**

\*     \*     \*

In addition to closing these three acquisitions in the past three months, the current pipeline of companies meeting our acquisition criteria still represents more than $150 million of annual revenue. **We remain confident that we will close an average of 1 to 3 acquisitions per quarter, going forward.**

154.   Pettit also made misleading statements in response to an analyst question about the amount available on the Credit Facility.  Pettit stated:

**James Albertine** - Stifel Nicolaus - Analyst
Okay, that's helpful, and I am sorry for belaboring the point. And then one more quick one. Could you just give us an update on what your, if you can, current liquidity position is as it relates to revolver capacity in light of the October deal? I think we can probably back into it, but I just want to hear from you guys where you stand with availability at this point.

**Scott Pettit** - Fenix Parts, Inc. - CFO
Yes, we have a current relationship with BMO Harris. Obviously, our agreement has certain covenants, and I think that's what you are referring to. **We have only the $8.7 million borrowed at this point. We have capacity under our line.** For every acquisition we do, we get incremental EBITDA, we get incremental inventory, and we get incremental receivables, which continues to grow that capacity.

So, **we have room to continue to do the expansion**. And we are looking at sitting down with our bank and potentially restructuring that arrangement so that we can have even further capacity as we move forward.

**Gary Prestopino** - Barrington Research - Analyst

Okay. And then in terms of the increase in the valuation for acquired inventory that you had to do in this latest quarter, that's really a thing of the past now, Scott? You know, we're not going to see (multiple speakers)?

**Scott Pettit** - Fenix Parts, Inc. - CFO
Well, we (technical difficulty) $9 million on the book as part of this transaction. And at this point, we relieved about $7 million of it. **So there's going to be more coming.** For each acquisition, we actually have to do a valuation and gross it up to fair market value. But the numbers will -- I mean, we'll highlight what they are, we'll break them out, and they should be significantly less than they were for this quarter.

155.   The above statements related to additional acquisitions and the Credit Facility were materially false and or misleading.   The above statements about acquisitions are materially false or misleading because Fenix did not have the funds, internal controls or accounting to continue to acquire one to three businesses per quarter.   In fact, Fenix was struggling to integrate the original eight companies without severe problems with the internal controls.   However, the above statements misled investors into believing that not only were additional acquisitions possible, but imminent.   The truth was that Fenix was improperly accounting for the inventory of the acquired companies and as a result would end up in default of the Credit Facility.   This resulted in the inability to acquire additional companies and eventually lead to Fenix's inability to continue as a going concern.

156.   The statements about the Credit Facility were also misleading because Fenix was actually in violation of the financial covenants of the Credit Facility and therefore could not borrow additional funds.  The statements above misrepresent the

capacity of the Credit Facility and Fenix's ability to acquire additional companies. In reality, these would be the last of Fenix's acquisitions and the Company would eventually be delisted from NASDAQ on June 29, 2017.

157. As stated above, Fenix's continual touting of its acquisition capability was material to investors. One of Fenix's main strategies for growth was to acquire companies. As a result analysts and investors relied heavily on these statements by Robertson and Pettit. On November 19, 2015, BMO Capital Markets published an analyst report issuing a buy rating in part because "The current acquisition pipeline remains strong at $150 million and management remains confident in its ability to close one to three acquisitions a quarter."

158. Pettit also made materially false statements on the call. For example, Pettit stated the following related to inventory, and accounting:

> Gross profit was $6.4 million during the quarter, **which included a $4.2 million amortization charge related to the gross-up of inventory stemming from the founding company combination.** As you may recall, the inventory value was increased to fair market value as part of the purchase accounting, and that incremental value has to be amortized through cost of goods sold as the inventory is sold. After netting out the impact of amortization, third-quarter gross profit margin was 39% compared to an average gross profit margin of approximately 34% in 2014.
>
> \*       \*       \*
>
> On the expense side, I'd like to highlight several non-cash charges during the quarter that are reflected in the cash flow statement in the 10-Q. The amortization of fair market value step-up of inventory, **as I mentioned earlier, was $4.2 million for the quarter and is $7 million year-to-date**.
>
> \*       \*       \*

We have brought financial reporting in-house, and no longer need to rely on outside consultants for compilations in the future. **This should also dramatically improve the review and audit process, leading to substantially lower professional fees in the quarters ahead.** It is also a great starting point to provide the level of detail that is more appropriate for our management team to gain insight into and run the business, going forward.

159.   The above statements relating to the improved review and audit process were false and or misleading because Fenix had material weaknesses in its internal controls relating to the valuation of inventory and its ability to determine whether an impairment charge should be taken.  Further, the statements relating to the inventory amortization were false and or misleading because Fenix was not properly accounting for inventory valuation, would have to amortize even more funds, and eventually discount a material amount of inventory.  As a result, the above statements were shown to be false and misleading when Fenix disclosed its internal weaknesses in internal controls and the actual amount of goodwill and inventory.

160.   These statements were material as they affected Fenix's ability to continue as a going concern and eventually lead to the delisting of Fenix from NASDAQ.

### *January 12, 2016 – Investor Presentation*

161.   On January 12, 2016, after hours, Fenix filed with the SEC a Form 8-K attaching its investor presentation.  The investor presentation touted the Company's "Robust Pipeline for Future Acquisitions" and stated that Fenix had a near to mid-

term acquisition pipeline of 19 companies.  The investor presentation also disclosed that the Company had a $55 million BMO credit facility with a $9.8 million term loan and only $8.7 million drawn against the credit facility.

162.   These statements were materially false or misleading because due to Fenix's improper accounting, lack of internal controls, and the amount withdrawn on previous acquisitions, Fenix was actually in violation of many financial terms of the Credit Facility and was incapable of additional borrowings.  Therefore, the above statements misled investors to believe that additional acquisitions were not only possible but imminent.  To date, Fenix has not made a single additional acquisition and is still in breach of the Credit Facility.

### *March 30, 2016 – Form NT 10-K*

163.   On March 30, 2016, Fenix filed with the SEC a Form NT 10-K announcing a delay in the annual report for the year ended December 31, 2015. Defendants stated in pertinent part:

> The Company will not complete the filing within the prescribed time period of its Annual Report on Form 10-K for the year ended December 31, 2015. The delay is necessary to provide the Company and its auditors with sufficient time to complete the audit of the Company's financial statements **taking into account the ramifications of an Amended and Restated Multicurrency Credit Agreement with BMO Harris Bank N.A. effective as of December 31, 2015**, which has been structured concurrently with the preparation of the Company's 2015 Annual Report on Form 10-K. This delay could not be eliminated by the Company without unreasonable effort and expense. In accordance with Rule 12b-25 of the Securities Exchange Act of 1934,

as amended, the Company will file its Form 10-K no later than the fifteenth calendar day following the prescribed due date.

164.   The above statements partially revealed to the market that Fenix was having liquidity issues with their Credit Facility.  The full truth, that Fenix was in violation of the terms of the Credit Facility and was no longer able to borrow under the facility, would not be revealed until August 16, 2016.  On this news, Fenix stock price dropped 4.5% on March 31, 2016, from a high of $4.79 to a low of $4.57, on unusually heavy volume.

*April 4, 2016 – Form 8-K*

165.   On April, 4, 2016, before the market opened, Fenix filed a Form 8-K with the SEC with the Amended and Restated Multicurrency Credit Agreement with BMO Harris Bank N.A.  Fenix stated in pertinent part:

> The Amended Credit Agreement amends the Original Credit Agreement by (a) adjusting the Applicable Margins applied to various loans and fees, (b) clarifying the method of calculating EBITDA, (c) including a revised method of calculating the Fixed Charge Coverage Ratio, (d) authorizing us to hold original vehicle titles and instituting a modified method of releasing liens on vehicle titles, (e) **making a change to the Total Leverage Ratio requirements for future acquisition of businesses, and (f) including certain other credit and financial revisions.** The Amended Credit Agreement has retroactive effect to December 31, 2015.

166.   Under its amended credit agreement, Fenix was required to maintain a total leverage ratio of greater than 3.75 to 1 for Q1/16, 3.50 to 1 for Q2/16-Q4/16, 3 to 1 for Q1/17 and for periods ending on or after June 30, 2017, 2.75 to 1.  Further,

going forward, Fenix was required to begin to generate positive adjusted EBITDA to increase its draw on its credit facility to consummate acquisitions.

167.   The above statements partially revealed to the market that Fenix was having liquidity issues with its Credit Facility.  However, the full truth, that Fenix was in violation of the terms of the Credit Facility and was unable to borrow additional funds, would not be revealed until August 16, 2016.

168.   On this news, Fenix stock price dropped from $5.01 at open on April 4, 2016, to an intra-day low of $4.79, a 4.3% drop on unusually heavy volume.

### April 14, 2016 – Form 10-K

169.   On April 14, 2016, Fenix filed a Form 10-K with the SEC announcing its yearly financials for the year ended December 31, 2015 (the "2015 Form 10-K"). Robertson and Pettit signed the 2015 Form 10-K on behalf of the Company.

170.   The 2015 Form 10-K reported that actual goodwill for the entire company including all acquisitions consisted of $76.8 million and inventory consisted of $38.89 million.   Further, Fenix revealed that goodwill from the Founding Companies (with adjustments) actually consisted of $73,245,000 and inventory consisted of $38,110,000. 2015 Form 10-K, at 58.   This included additional adjustments of $3.067 million in inventory and an additional $2.810 million in goodwill. This revealed to the market the true price of goodwill prior to the impairment charge.

171.   Fenix also disclosed that "the Subsidiaries contributed a $10.0 million increase in our recycled OEM and related products inventory during 2015, of which, approximately $8.6 million was amortized through cost of goods sold. As of December 31, 2015, the unamortized fair value inventory adjustment is approximately $1.4 million." This partially revealed to the market that Fenix's inventory valuation was false and misleading.

172.   Finally, Fenix partially disclosed its limitations on the Credit Facility. Fenix stated that although the Credit Facility had a revolving credit amount of $20 million, and Fenix had only used $11.2 million, the capacity under the Credit Facility was only $4.7 million after considering the applicable financial covenants and restrictions. This partially revealed to the market that Fenix was having liquidity issues with the Credit Facility.

173.   Based on these partial disclosures, Fenix's stock dropped from $5.07 at close on April 14, 2016, to open at $4.74 on April 15, 2016, a drop of 6.5%, on unusually heavy volume.

174.   However, even with this partial disclosure, Fenix's 2015 Form 10-K continued to mislead investors about its internal controls, inventory valuation and goodwill, and the amount available under the credit agreement.

175.   Fenix's statement that it had approximately $4.7 million in available borrowings available under the Credit Facility was materially false and misleading

because in reality, Fenix was already in breach of the financial terms of the Credit Facility due to the false inventory and goodwill values.

176.   Further, Fenix made misstatements about its goodwill impairment. Fenix stated that it completed its initial annual goodwill impairment test as of October 1, 2015, which was before the acquisitions of Tri-City and Butler, using its forecasted plan and other long-term financial projections and assumptions.  Fenix stated in pertinent part:

> The Company determined that it was necessary to perform a quantitative assessment of its goodwill for the purpose of determining whether goodwill impairment existed at October 1, 2015. . . [T]he Company **concluded its WACC and terminal growth rates were approximately 10% and 3%, respectively**. With all other assumptions remaining constant, to the extent that either the WACC increases by 1.0% the terminal growth rate decreases by 0.5%, proceeding to step 2 of the impairment analysis, as indicated in ASC Topic 350, *Intangibles - Goodwill and Other*, would be necessary.
>
> As a result of the quantitative analysis, where the fair value was computed, it was calculated that **the fair value of the Company's reporting unit exceeded its carrying value by approximately 8.5%.** The Company will continue to monitor the actual results of its operations against its long-term plan and re-evaluate goodwill as required in between the annual measurement period if events and circumstances indicate that it is more likely than not the asset is impaired. The determination of fair value is highly sensitive to differences between estimated and actual cash flows and changes in the related discount rate used to evaluate the fair value of the reporting unit where the goodwill resides. Based on the discounted cash flow valuation at October 1, 2015, a 1% increase in the WACC, terminal growth rate decrease by 0.5%, shortfall against budgeted revenue and gross profit in excess of 2% or changes in other significant variables in the future could potentially result in impairment of goodwill.

Further, **there were no qualitative events or indicators through December 31, 2015 that management believes would call into question the analysis as of October 1, 2015.** To the extent that there is volatility in the Company's stock price, a significant economic downturn, further reduction in scrap prices, further reduction in the Canadian exchange rate, variation in vehicle accident rates, change in state or federal laws, significant increases in vehicle procurement costs or changes in other variables that can materially impact its business, the Company may need to evaluate goodwill for impairment in between the annual measurement period if events and circumstances indicate that it is more likely than not the asset is impaired.

2015 Form 10-K, at 71-72.

177.    This statement was false because there was already volatility in Fenix's stock, and Fenix knew that it should have used a higher WACC calculation. On June 28, 2016, just two months after the Form 10-K came out, Fenix disclosed that it calculated goodwill impairment as of March 31, 2016 (prior to the release of the 2015 Form 10-K). Fenix recalculated its goodwill using the correct WACC of 13%. As a result, Fenix's carrying value exceeded its book value and Fenix was forced to take a $43.3 million impairment charge.

178.    The Company also misrepresented its internal controls. For example the Company stated:

We have evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2015, the end of the period covered by this report on Form 10-K. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective because of material weaknesses in our internal control over financial reporting. These material weaknesses were attributable to (A) our lack of (i) accounting personnel with an appropriate level of accounting

knowledge, experience and training commensurate with our financial reporting requirements, **(ii) procedures to prepare and for management to review account reconciliations and other analyses on a timely and systematic basis to appropriately document and support the recording of financial information, including purchase accounting entries**, and (iii) thorough review of significant contracts for key accounting ramifications, as well as (B) undue reliance on the findings and conclusions of third-party specialists without an appropriate level of internal review, and (C) limited segregation of duties and access rights controls over information systems at Subsidiaries without compensating corporate procedures and controls. Some of these weaknesses were previously described in our final prospectus dated May 14, 2015, and in our previously filed quarterly reports on Form 10-Q for the periods ended March 31, 2015, June 30, 2015, and September 30, 2015.

2015 Form 10-K, at 100.

179.   This statement was false and/or misleading because as the Company later disclosed, the Company did not have "procedures to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, contingent consideration, ***potential goodwill impairment and inventory valuation***."

180.   The above misrepresentations were material. Fenix's improper accounting and lack of internal controls caused Fenix to be in breach of its Credit Facility.  Fenix's ability to borrow under the Credit Facility and continue as a going concern was materially important to investors.  The true facts stated above would have materially altered the information available to investors and would have affected their decision of whether to purchase Fenix securities.

181.   Finally, the 2015 Form 10-K was materially misleading given that it included certifications by Robertson and Pettit pursuant to SOX.   These certifications indicated that Robertson and Pettit had both reviewed the Q3 2015 Form 10-Q and that it was materially accurate and not misleading. Specifically, Robertson and Pettit each certified that:

1. I have reviewed this Annual Report on Form 10-K of Fenix Parts, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules l3a-15 (e) and 15d-15 (e) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the

reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. **all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

b. **any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(2015 Form 10-K, Exs. 31.1 & 31.2.)

182.   Given the false and/or misleading nature of the statements in the 2015 Form 10-K described above, Robertson's and Pettit's certifications were false and/or materially misleading.  These omissions and/or misrepresentations were material to

75

Fenix's investors because investors would have declined to purchase Fenix's stock had they known that the 2015 Form 10-K contained material misrepresentations and/or omissions.

<u>*April 15, 2016 – Earnings Call*</u>

183.   On April 15, 2016, Fenix held an Earnings Conference Call to discuss the financial results for the year ended December 31, 2015.  Robertson stated in pertinent part:

> The third challenge we've continued to confront is the cost and effort associated with combining the eight Founding Companies and **the appropriate GAAP accounting** and SEC reporting necessary as a public company. We've moved away from the reliance on outside providers to compile our financial statements and are now doing that work in-house.

184.   This statement partially revealed to investors that Fenix was in violation of GAAP and struggling with its internal controls.  Just a month later, Fenix would announce that it would have to take an impairment charge on goodwill.

185.   Fenix also revealed that it was limited under the Credit Facility. In response to an analysts question Robertson stated:

> **Matt Koranda**
> Hey, guys. Thanks for taking the questions. Just wanted to follow the line of questioning that Jamie was on regarding acquisitions, and I wanted to dig into a bit deeper maybe, I know you guys still have the 150 million pipeline and that the revise credit agreement with BMO does enable acquisitions for you guys. But I guess what I'd like to figure it sort of with the revise covenants and I guess the availability in the 10-K you guys had called out was $4.7 million on the revolver. Could you just talk about that gating item to your ability to get acquisitions done

during 2016 and sort of how you see that expanding throughout the year?

**Kent Robertson**
Well, obviously with BMO we've got a great relationship with our bank and they're working through the new terms, the credit agreement was a big step for us. Now, the way the facility is structured is really around the performance of the business. **So while our performance, historical performance doesn't get us where we need to be for expanding that facility, we certainly have within the facility the ability to get back, so it doesn't prohibit us, it just at this point based on financial metrics, we're at place where we can't do much with it.** So, again as the numbers come through, that will open backup for us.

186.   This statement partially revealed to investors that Fenix had liquidity problems and would not be able to make acquisitions for some time.

187.   On this news, Fenix's stock price dropped from an intra-day high of $5.20 per share on April 15, 2016, to close at $4.96 per share of common stock, a 4.6% drop on unusually heavy volume.

188.   Robertson and Pettit also made additional material misrepresentations on the call.  Robertson stated:

Another area of focus continues to be on growth through acquisition. In October, we closed the second and third acquisitions into our May IPO with the purchase of Butler Auto Sales and Tri-City Auto Salvage, both of which are located in North Carolina. Butler is a full-service auto recycling facility located in for Forest City, North Carolina that services Charlotte and the surrounding markets; and Tri-City is a full-service automotive recycling facility servicing Greensboro, Raleigh-Durham, and the surrounding markets.

*   *   *

Fenix Parts' reputation continues to grow throughout the industry, as other auto part recyclers recognize the positive impact we are having

on our acquired companies and the markets we serve. The acquisition pipeline is robust. The companies in our pipeline that meet our acquisition criteria still represent more than $150 million of annual revenue.

**We have numerous deals in various stages of the acquisition process.** And while we don't control the exact timing, we are pleased with our progress. **Our future cadence will obviously be influenced by our operating performance, availability under our credit facility**, and the nature and form of consideration for each transaction.

189.   Robertson also elaborated when questioned by analysts. For example:

**James Albertine**
Okay. And then shifting to M&A quickly, one to three deals a quarter with sort of the target we discussed while back. This is great that you've gone back and done all the heavy lifting. I'm sure it was appropriately distracting to management and maybe took your shifted priorities away from acquisitions for the short term. Can we expect though that one to three goal sort of going forward, I mean, we haven't seen anything in the first quarter obviously and sound like anything is percolating imminently, but just want to get a sense of the cadence there?

**Kent Robertson**
Yes. **We're comfortable of that the one to three deal cadence as far as our ability to acquire the companies and integrate them, we feel comfortable with that.** Obviously we got to get our performance in line, so as we get that EBITDA numbers back up and get things where it need to be I think that freeze up [sic] more capacity in the deal flow starts back with it.

**James Albertine**
Is it reasonable to expect the deal flow starts backup for the second half this year or is it going to take a little bit longer than you thought?

**Kent Robertson**
I think that's right. I think that as – as we're executing now you see sort of the water starting to clear with Q4, I think that continues to get better and as that happens and I think the deal flow start. I think we are probably in that time line makes sense.

190.   Pettit also made false and/or misleading statements. Pettit stated:

Looking at our balance sheet, at December 31, 2015, we had $2.8 million of cash and cash equivalents on-hand; a $9.6 million term loan outstanding; **and $11.2 million in borrowings against a revolving line of credit.** The additional borrowings under our revolving line of credit were largely used to fund the Butler and Tri-City acquisitions in October.

\*     \*     \*

A final note about 2015 before I turn it back to Kent. Before the IPO we had two employees. We relied heavily on the founding companies' historic cash basis statement and outside consultants to perform the initial GAAP accounting and SEC reporting.

During the fourth quarter we moved those functions in-house using a consolidated general ledger and SEC reporting software. That process from no GAAP in SEC reporting capacity to outsourcing those functions to moving them in-house has created a fair amount of challenges.

191.   In response to analysts questions, Pettit stated in pertinent part:

**Gary Prestopino**
Okay. And then just looking at your slide 20 on your capital structure, do I have this right, you have about 26 million left on the BMO credit facility plus 4.7 million under the revolver, and then your cash flow, it looks like about 33 million, 34 million of total liquidity, or am I wrong there?

**Scott Pettit**
I think we look at it as about; we have the 9.6 million term loan, the $11.2 million that's on a revolver. We get the 5.9 million letter of credit we have for Canada is counted against this on that. **So we got $2.8 million in cash and then that $4.7 million in U.S. on the revolver, that's really our liquidity at those two items.** To the extent that we want to go back and expand that term loan or do something different with the bank **we have the capacity to do that**, but it's got to be mutually agreed upon between the bank and Fenix.

192.   The above statements related to additional acquisitions and the Credit Facility were materially false and or misleading. The above statements about acquisitions are materially false or misleading because Fenix did not have the internal controls or accounting to continue to acquire one to three businesses per quarter. Further, Fenix was actually in violation of the Credit Facility at the time of these statements. Had Fenix used the correct numbers to account for inventory and goodwill, Fenix would have been forced to disclose the violation of the Credit Facility sooner and risked its ability to continue as a going concern.

193.   As stated above, Fenix's continual touting of its acquisition capability was material to investors. One of Fenix's main strategies for growth was to acquire companies. As a result, analysts and investors relied heavily on these statements by Robertson and Pettit.

### _May 23, 2016 – Form 8-K_

194.   On May 23, 2016, post-market, Fenix filed a current report with the SEC on Form 8-K ("May 23, 2016 Form 8-K") announcing that the Company was unable to timely file its Form 10-Q. The Company stated in pertinent part:

> On May 16, 2016, Fenix Parts, Inc. (the "Company") filed a Form 12b-25, extending the filing date for its Quarterly Report on Form 10-Q for its fiscal quarter ended March 31, 2016 (the "10-Q"). The Company was unable to file its 10-Q by the extended filing date, due to the ongoing review of certain accounting issues, **including a potential goodwill impairment, inventory valuation,** and finalizing adjustments to contingent consideration liabilities, the related income

tax effects of resolving these matters **and the impact of these issues
on the Company's Amended and Restated Credit Agreement**.

195.   This announcement was the first time Fenix reported to the market that
it would have to take a goodwill impairment charge and that it would affect the
Credit Facility.   Although the exact amount of the impairment charge was not
revealed until June 28, 2016, this announcement materially impacted the market.

196.   On this news, shares of Fenix decreased from $4.00 per share at close
on May 23, 2016, to an intra-day low of $3.89 per share on May 24, 2016, a 2.75%
drop in stock price, on unusually heavy volume.

### *June 28, 2016 – Form 10-Q*

197.   On June 28, 2016, post-market, Fenix filed a quarterly report on Form
10-Q with the SEC announcing the Company's financial and operating results for
the quarter ended March 30, 2016 (the "Q1 2016 Form 10-Q").   Defendants
Robertson and Pettit signed the quarterly report on behalf of the Company.

198.   The Q1 2016 Form 10-Q partially revealed to investors the true nature
of Fenix's goodwill.   Fenix disclosed that goodwill was actually $83,671,000 for
Fenix as of March 31, 2016 for all of the Acquired Companies.   Further, Fenix
disclosed that after analyzing the increase in goodwill, the inventory valuation, and
the drop in stock price it was taking a goodwill impairment charge of $43.3 million
to reduce the carrying value of goodwill.   Fenix stated in pertinent part:

Pursuant to the provisions of FASB ASC Topic 350, "Intangibles - Goodwill and Other," goodwill is required to be tested at the reporting unit level for impairment annually or whenever indications of impairment arise. Management has determined the Company operates as one operating segment and one reporting unit, Automotive Recycling, and all the goodwill is considered attributable to that reporting unit for impairment testing. **The Company performed its annual goodwill impairment test for 2015 as of October 1, 2015, also updated as of December 31, 2015, and management determined that no impairment of goodwill existed at either date.**

\*       \*       \*

In addition to market capitalization analysis, together with a third party valuation expert, **the Company re-performed a discounted future cash flow analysis for the purpose of determining the amount of goodwill impairment.** Such analysis relies on key assumptions, including, but not limited to, the estimated future cash flows of the reporting unit, weighted average cost of capital ("WACC"), and terminal growth rates of the Company. The determination of fair value is highly sensitive to differences between estimated and actual cash flows and changes in the WACC and related discount rate used to evaluate the fair value of the reporting unit. In evaluating the key variables this time, management (i) reduced the estimated future cash flows based upon actual results achieved during the three months ended March 31, 2016 and revised projections, **and (ii) concluded that the Company's WACC and terminal growth rates were 13% and 3%, respectively, as compared to 10% and 3% used in the test at October 1, 2015.**

Based on the result of this second step of the goodwill impairment analysis as of March 31, 2016, combining the market capitalization and discounted cash flow methodologies, **the Company recorded a $43.3 million non-cash charge to reduce the carrying value of goodwill**. The Canadian Founding Companies were acquired in 2015 in an asset purchase, and the tax benefit associated with the portion of this charge related to the Canadian Founding Companies was offset by a valuation allowance because of the uncertainties associated with generating future taxable income in Canada.

(1Q 2016 Form 10-Q, at 9, 19.)

199.   This corrective disclosure partially revealed the truth about Fenix's improper accounting policies and inability to adequately account for goodwill and inventory.  Prior to filing the Form 10-K on April 14, 2016, Fenix calculated its goodwill impairment using a lower WACC despite knowing they would have to recalculate it just two months later.  Given Fenix's later admission on February 21, 2017, that it did not have the proper procedures to analyze and record goodwill and inventory valuation, Fenix should have discovered and announced the goodwill impairment much sooner.

200.   Further, despite this corrective disclosure, Fenix continued to mislead investors about its capacity to borrow under the Credit Facility and its ability to account for acquired inventories. Fenix stated the following about the Credit Facility:

> Effective December 31, 2015, the Company entered into a $35.0 million amended and restated senior secured credit facility with BMO Harris Bank N.A. (the "Amended Credit Facility" or "Credit Facility") (see Note 4 below for further details) which replaced the original Credit Facility with BMO Harris Bank N.A. (the "Original Credit Facility"). Effective March 31, 2016, the Company entered into a first amendment to the Amended Credit Facility. The Company's previous borrowings under the Original Credit Facility remained outstanding under the Amended Credit Facility. As of March 31, 2016, the Company had working capital of $24.4 million, including cash and cash equivalents of $2.2 million, owed $21.3 million under the Credit Facility (consisting of a term loan with a balance of $9.6 million and a revolving credit facility with a balance of $11.7 million), and had $6.4 million outstanding standby letters of credit under the Amended Credit Facility. **At March 31, 2016, the Company had approximately $1.9 million in available U.S. Dollar borrowings and $2.9 million in**

**available Canadian Dollar borrowings that can be drawn in under its revolving line of credit after considering the applicable financial covenants and restrictions in the Amended Credit Facility.** The term of the revolving credit facility and the term loan is five years from the date of the Original Credit Facility, expiring on May 19, 2020. While Fenix has been successful in securing financing to provide adequate funding for working capital purposes, compliance with the financial covenants and restrictions in the Amended Credit Facility is measured quarterly and determines the amount of additional available credit, if any, that will be available in the future. There is no assurance that management will be successful in integrating the business in a timely manner or in obtaining additional or replacement financing, if needed, to sufficiently fund future operations, repay existing debt or implement its growth strategy. The Company's failure to execute on this strategy and generate positive cash flow may have a material adverse effect on its business, results of operations and financial position.

201.   The above statement was misleading because Fenix represented to investors that it was still capable of borrowing under the Credit Facility.  In reality, Fenix failed to comply with the Credit Facility's financial covenants "due primarily to (i) **lower asset values as a result of reductions during 2016 to the aggregate estimated fair value of acquired inventory**, which reduced the Company's borrowing base, (ii) **limits on certain non-cash adjustments** to calculate EBITDA for covenant compliance, and (iii) lower than forecasted EBITDA during the third quarter of 2016 because of a decline of approximately 5% in quarterly net revenues (as compared to a Company record level of net revenues for the quarter ended June 30, 2016) and higher operating expenses, **including significant accounting, legal and other fees primarily as a result of the transition to a new public accounting firm beginning in July 2016 and the previously reported SEC inquiry."**  Further,

as the Company disclosed on February 21, 2017, this violation casted a substantial

doubt on Fenix's ability to continue as a going concern.

202.   Fenix's ability to continue to acquire companies was highly material

and Fenix's representations misled investors.  BB&T issued a "Buy" rating dated

June 30, 2016, due in part because "management did not rule out the potential to see

an acquisition sometime in Q4'16."

203.   The Company also made the following misrepresentations in regards to

the value of the acquired inventories:

> During the three months ended March 31, 2016, **the Company
> reduced the aggregate estimated value of the acquired inventories
> by $7.3 million to reflect the most recent historical information
> available regarding excess and unsaleable parts acquired as well as
> sales discounts given to sell certain acquired parts.** This inventory
> adjustment resulted in a $1.6 million increase in intangible assets
> (customer relationships), a $2.4 million reduction in deferred income
> taxes **and a $3.3 million increase in goodwill**. In accordance with
> ASU No. 2015-16, as discussed in Note 2 above, the adjustment also
> resulted in a reduced charge to cost of goods sold during the three
> months ended March 31, 2016 of approximately $3.4 million consisting
> of $2.1 million for the opening inventory mark up to fair value (see (i)
> below) and approximately $1.3 million, related to the lower value of
> acquired inventories sold between the respective acquisition dates and
> December 31, 2015. The $2.1 million adjustment to the opening
> inventory markup had a related $0.8 million deferred tax liability. The
> $2.1 million and the $0.8 million were previously recorded through the
> prior period operations and were adjusted through the operations for the
> three months ended March 31, 2016 within the cost of goods sold and
> the tax benefit line items respectively.

204.   The above statements partially disclosed the true state of Fenix's

internal control over accounting inventory.   Further, the statements are also

misleading because as disclosed on February 21, 2017, Fenix should have taken "an

additional reduction of $3.5 million in the estimated value of acquired inventories

[that] should have been recorded in the consolidated financial statements as of and

for the three months ended March 31, 2016."

205.   The Company also made material misrepresentations about its internal

controls.  Fenix stated it lacked internal controls in the following areas:

> We have evaluated the effectiveness of our disclosure controls and
> procedures as of March 31, 2016, the end of the period covered by this
> report on Form 10-Q. Based on that evaluation, our Chief Executive
> Officer and Chief Financial Officer concluded that the Company's
> disclosure controls and procedures were not effective because of
> material weaknesses in our internal control over financial reporting.
> These material weaknesses were attributable to (A) our lack of (i)
> accounting personnel with an appropriate level of accounting
> knowledge, experience, and training commensurate with our financial
> reporting requirements, (ii) **procedures to prepare and for
> management to review account reconciliations and other analyses
> on a timely and systematic basis to appropriately document and
> support the recording of financial information, including purchase
> accounting entries,** and (iii) thorough review of significant contracts
> for key accounting ramifications, as well as (B) undue reliance on the
> findings and conclusions of third-party specialists without an
> appropriate level of internal review, and (C) limited segregation of
> duties and access rights controls over information systems at
> Subsidiaries without compensating corporate procedures and controls.
> These weaknesses were previously described in our annual report on
> Form 10-K for the year ended December 31, 2015 filed on April 14,
> 2016.

206.   However, these statements were false because as the Company later

disclosed, the Company omitted to inform investors that it did not have "procedures

to prepare, document and review areas of significant judgments and accounting

estimates, including purchase accounting, **contingent consideration, potential goodwill impairment and inventory valuation**."

207.   Finally, the Q1 2016 Form 10-Q was materially misleading given that it included certifications by Robertson and Pettit pursuant to the Sarbanes-Oxley Act ("SOX"). These certifications indicated that Robertson and Pettit had both reviewed the Q1 2016 Form 10-Q and that it was materially accurate and not misleading. Specifically, Robertson and Pettit each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2016 of Fenix Parts, Inc.;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. **All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

    b. **Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.**

(Q1 2016 Form 10-Q, Exs. 31.1 & 31.2.)

208. Given the false and/or misleading nature of the statements in the Q1 2016 Form 10-Q described above, Robertson's and Pettit's certifications were false and/or materially misleading. These omissions and/or misrepresentations were material to Fenix's investors because investors would have declined to purchase

Fenix's stock had they known that the Q1 2016 Form 10-Q contained material misrepresentations and/or omissions

<u>*June 29, 2016 – Earnings Conference Call*</u>

209.   On June 29, 2016, Defendants Robertson and Pettit held an earnings conference call on behalf of the Company to discuss Fenix's quarterly results for the period ended March 30, 2016.  Robertson and Pettit were on the call.  Pettit discussed the Company's financial results for the quarter.   In addition to the adjustments revealed on the Q1 2016 Form 10-Q, Pettit stated in pertinent part:

> Let me spend a little more time on this, as I mentioned, a review of goodwill was triggered by a reduction in the Company's stock price. This forced the reevaluation of the historic earnings through Q1 2016, and our projections for the future. The lack of a combined operating history and variability in the gross profit margins, has forced us to reevaluate the weighted average cost of capital more specifically the Company's specific risk premium used in the calculation for enterprise value. The value of the company was determined based on a combination of market capitalization and the revised enterprise value. This resulted in a 43.3 million non-cash charge that brings the goodwill balance on our financial statements down to 37.8 million. This is an addition to the 35.1 million of intangible assets on the balance sheet.

> Looking at our balance sheet at March 31, 2016 we had 2.2 million of cash and cash equivalents on-hand. A 9.6 million term loan outstanding and 11.7 million in borrowings against our revolving line of credit. As part of the wrap-up of the 10-Q, we amended the credit facility with BMO Harris. The amendment incorporates language to address the non-cash adjustments in the current period, **and the impact of the goodwill impairment on the leverage and network covenant.** The amendment also addressed the covenants for the remainder of this year in 2017.

We have historically used our IPO proceeds and availability under our credit arrangements to fund the acquisitions and cash needs of the business. Moving forward, as our operating performance continuous to improve, we would expect cash flow from operations to be the primary source to fund the cash needs of the business. We will continue to refine our capital structure based on business performance, **acquisition opportunity and availability under our credit facilities.**

210.    Robertson and Pettit also responded to analysts' questions.    For

example:

**Matt Koranda**

Okay, a couple of quarters, so essentially it sounds like may be [additional acquisitions] could potentially be kick started as early as Q4 of 2016, but we shouldn't expect anything prior to that?

**Kent Robertson**

Yes that's right, I think we're thinking that, a quarter or two here to sort of stabilize the business from a banking perspective **gets us going again on the expansion by year-end.**

*       *       *

**Tony Cristello**

Okay, and on the inventory, I guess with essentially a revaluation of 7 million or so. Is that simply you had inventory you couldn't sell or was it inventory that you just purchased that was -- I'm just trying to understand that it's kind of a big number, so where was the bulk of that 7 million or so?

**Kent Robertson**

So of the roughly $35 million to $40 million of inventory we had on the books. What we've done is gone through and look at redundancies between each of our locations. We've gone through and changed the way we're buying in order to ensure that we are not buying the same parts over again. But as we've looked at our experience, **what happened for the year prior to doing the acquisitions and the**

**historic experience for deletions and discounts and gross profit margins on the inventory that was out there.** What we've experienced in the first year, as we've gone through and cleaned up the inventory and repriced some things, is the assumption is that that current set of statistics applied not only to the beginning balance sheet but will apply going forward, so it does represent a fairly significant change to what was there historically, it is both, the actually the 7 million is a combination of two things, one is the inventory, actually three things. The inventory itself, the labor and overhead that was capitalized, as well as the step-up, so there is three components that go into that $7 million figure. The actual inventory piece was roughly 3 to 3.5, the step-up was a couple of million dollars and the balance represents the labor and overhead component that was written off.

*     *     *

### Gary Prestopino

So, another couple of questions here, given what you just had to go through this quarter with all of the adjustments, the inventory and all that. Are you at this point feeling that you've got the methodologies now to satisfy your orders in terms of at least being able to get these numbers out on a timely basis?

### Kent Robertson

Yes, actually we've done our internal close for April and May we're on-track for June, **we've got the methodologies worked out with our auditors, as far as how we look at inventory and cost of goods sold.** We are not anticipating any significant unusual items this quarter, so I think we're on-track I mean buying anything that would change that, I mean our books are getting closed on a monthly basis we're moving forward we expect to file timely.

211.   The above statements were false and/or misleading because they misled investors into believing that Fenix was capable of making additional acquisitions at the end of the year.  In reality, Fenix was already in breach of the Credit Facility and this would materially impact Fenix's ability to continue as a going concern.

91

212.   As stated above, Fenix's ability to continue acquiring companies and continue trading on NASDAQ was very material to investors and would have altered the total information on the market.

*July 11, 2016 – Form 8-K*

213.   On July 11, 2016, post-market, Fenix filed a current report with the SEC on Form 8-K ("July 11, 2016 Form 8-K") announcing that the Company had dismissed its public accounting firm BDO effective immediately, and have replaced them with Crowe Horwath LLP.  The Company stated in pertinent part:

> During the fiscal years ended December 31, 2015 and 2014, and through the Dismissal Date, there were no "reportable events," except that the Company's independent registered public accounting firm identified material weaknesses in the Company's internal control over financial reporting, as defined under Item 304(a)(1)(v) of Regulation S-K and as disclosed in the Company's most recent Form 10-K. These material weaknesses were attributable to (A) our lack of (i) accounting personnel with an appropriate level of accounting knowledge, experience and training commensurate with our financial reporting requirements, (ii) procedures to prepare and for management to review account reconciliations and other analyses on a timely and systematic basis to appropriately document and support the recording of financial information, including purchase accounting entries, and (iii) thorough review of significant contracts for key accounting ramifications, as well as (B) undue reliance on the findings and conclusions of third-party specialists without an appropriate level of internal review, and (C) limited segregation of duties and access rights controls over information systems at Subsidiaries without compensating corporate procedures and controls. In an effort to remediate deficiencies in its internal controls, the Company is in the process of adding personnel to its accounting staff, standardizing financial reporting policies and procedures and upgrading its internal accounting systems. In addition, the Company has implemented steps to establish a Company-wide system of uniform account classifications and is migrating all

operations to common information systems. This is a significant task and an integral part of the Company's integration plan for acquired businesses, which may require an extended period of time to complete.

214.   This announcement revealed to the market that Fenix was having substantial problems with its internal controls and the valuation of inventory and accounting.  BDO had been with Fenix since the beginning and on June 29, 2017, less than two weeks prior, Fenix told investors they had just "got the methodologies worked out with our auditors, as far as how we look at inventory and cost of goods sold."   BDO's abrupt resignation signaled to the market that something was inherently wrong.

215.   On this news, shares of Fenix decreased from $4.13 per share at open on July 12, 2016, to an intra-day low of $4.00 per share, a 3% drop, on unusually heavy volume.

### *August 16, 2016 – Form NT-10-Q*

216.   On August 16, 2016, Fenix filed a notification of late filing on Form NT 10-Q ("August 2016 Form NT 10-Q") with the SEC.  The Form was signed by Robertson on behalf of the Company.  The Company stated in pertinent part:

> The Company's filing of its quarterly report on Form 10-Q for the quarter ended June 30, 2016 has been delayed due to the transition time necessitated by the Company's recent change in its auditors. This delay could not have been eliminated by the Company without unreasonable effort and expense.
>
> In addition**, the Company was not in compliance with a certain loan covenant in its credit facility and had not yet received a written**

**waiver from the lender for such non-compliance as of the due date of the Form 10-Q.** The Company has been in discussions with the lender with respect to the written waiver, which the Company expects to receive.

217.   This announcement partially revealed to investors that Fenix was in violation of the Credit Facility and would no longer be able to borrow under it. However, it still misled investors as to the reasons why Fenix was in violation of the Credit Facility.  As would later be disclosed on February 21, 2017, the Company's failure to comply with the Credit Facility's financial covenants as of June 30, 2016 and September 30, 2016 was due primarily to (i) **lower asset values as a result of reductions during 2016 to the aggregate estimated fair value of acquired inventory**, **which reduced the Company's borrowing base,** (ii) **limits on certain non-cash adjustments** to calculate EBITDA for covenant compliance, and (iii) lower than forecasted EBITDA during the third quarter of 2016 because of a decline of approximately 5% in quarterly net revenues (as compared to a Company record level of net revenues for the quarter ended June 30, 2016) and higher operating expenses, including significant accounting, legal and other fees primarily as a result of the transition to a new public accounting firm beginning in July 2016 and the previously reported SEC inquiry.

218.   On this news, shares of Fenix decreased from $4.73 per share at close on August 16, 2016, to an intra-day low of $4.39 per share on August 17, 2016, a 7% drop in stock price, on unusually heavy volume.

94

<u>*August 23, 2016 – Form 8-K & Press Release*</u>

219.   On August 23, 2016, post-market close, Fenix filed a Form 8-K and attached a Press Release announcing that the Company had come to an agreement with BMO on the Credit Agreement and that it was almost complete with its quarterly filing.  The Amendment stated in pertinent part:

> The Borrowers have advised the Lenders that the Borrowers were not in compliance with (a) Section 6.5(a) of the Credit Agreement with respect to the delivery of their Borrowing Base Certificate and related reports for the fiscal quarter ended June 30, 2016, and (b) Sections 6.5(b) and (j) of the Credit Agreement with respect to the delivery of their quarterly financial statements and covenant compliance certificate for the fiscal quarter ended June 30, 2016 (collectively, the *"Existing Defaults"*), and have requested that such Existing Defaults for such periods be waived. Subject to the satisfaction of the conditions precedent set forth in Section 3 below, the Lenders hereby waive the Existing Defaults for, and only for, the periods set forth herein; *provided* that Borrowers hereby agree to deliver to the Administrative Agent their Borrowing Base Certificate and related reports for the fiscal quarter ended June 30, 2016, and their quarterly financial statements and covenant compliance certificate for the fiscal quarter ended June 30, 2016, no later than September 2, 2016 (and the failure to do so shall constitute an Event of Default under the Credit Agreement). This waiver is limited to the matters and for the periods expressly set forth above. Except as specifically waived hereby, all terms and conditions of the Credit Agreement shall stand and remain in full force and effect. Without limiting the foregoing, the parties acknowledge and agree that the Borrowers are required to comply with all of the covenants described herein for all measurement and reporting periods ending on or after the Second Amendment Effective Date.

220.   The above misstatements partially revealed that Fenix was in breach of covenants in the Credit Facility relating to the Borrowing Base.  However, the full

extent of the violations of the Credit Facility were not disclosed until February 21, 2017.

221.   On this news, shares of Fenix decreased from a close of $5.24 per share on August 23, 2016, to an intra-day low of $4.63 per share on August 24, 2016, a drop in stock price of 11.6%, on unusually heavy volume.

*October 13, 2016 – Form 8-K & Press Release*

222.   On October 13, 2016, pre-market, Fenix filed a current report with the SEC on Form 8-K ("October 13, 2016 Form 8-K") announcing that the Company was being investigated by the SEC and as a result had delayed filing its Quarterly Report on Form 10-Q for the second quarter of 2016.  Fenix stated in pertinent part:

> The Company has delayed filing its Quarterly Report on Form 10-Q for the second quarter of 2016 to complete quarterly review and first-time-through procedures, which are still ongoing. The delay has been, in large part, caused by the complexity of accounting for the Company's multiple business combinations, the coordination of the transition of responsibilities between the Company's prior and new independent registered public accounting firms, and additional procedures on purchase accounting and inventory following the Company's recent receipt of a subpoena from the Chicago Regional Office of the SEC requiring the production of various documents. **The SEC inquiry appears to be focused on the Company's recent change in its independent registered public accounting firm, its previously announced business combinations and related goodwill impairment charge, the effectiveness of its internal control over financial reporting and its inventory valuation methodology.** The Company's receipt of a subpoena from the SEC does not mean that it has violated the securities laws, and management does not believe that the inquiry will have a material impact on the Company's financial condition, results of operations or cash flow, but cannot predict the duration or outcome of the inquiry.

96

> As previously announced, on August 23, 2016 the Company received a non-compliance notice from The Nasdaq Stock Market stating the Company is not in compliance with Nasdaq Listing Rule 5250(c)(1) because it had not timely filed its Form 10-Q with the SEC for the quarter ended June 30, 2016. Under Nasdaq rules, the Company has 60 days to file the second quarter Form 10-Q or to file a plan of compliance satisfactory to Nasdaq. The Company expects to either file its second quarter Form 10-Q or to file a satisfactory plan of compliance with Nasdaq within the required time.

(October 13, 2016 Form 8-K.)

223.    This corrective disclosure partially revealed to investors the extent of Fenix's lack of internal controls.  As Fenix would later disclose, it would have to discount its inventory even further and eventually would be delisted from the exchange.

224.    On this news, shares of Fenix declined $0.75 from $3.87 per share at close on October 12, 2016, to $3.12 per share at open on October 14, 2016, a 19% drop, on unusually heavy volume.

### *November 15, 2016 – Form NT 10-Q*

225.    On November 15, 2016, Fenix filed a notification of late filing on Form NT 10-Q ("November 2016 Form NT 10-Q") with the SEC.  The Form was signed by Robertson on behalf of the Company.  The Company stated in pertinent part:

> More specifically, the delay is attributable in large part to the complexity of accounting for the Company's multiple business combinations, the coordination of the transition of responsibilities between the Company's prior and new independent registered public accounting firms, and additional procedures on purchase accounting and inventory following the Company's recent receipt of a subpoena

from the Chicago Regional Office of the SEC requiring the production of various documents.

In addition, **the Company was not in compliance with a certain loan covenant in its credit facility** and had not yet received a written waiver from the lender for such non-compliance as of the due date of the Form 10-Q. The Company has been in discussions with the lender with respect to the written waiver, which the Company expects to receive.

226.   Fenix's November 2016 Form NT 10-Q revealed to investors that Fenix was in breach of certain covenants in the Credit Facility and it may be unable to borrow under it in the future.  This announcement was material because previously Fenix had relied on the Credit Facility market that the Company had the ability to acquire 1 to 3 companies per quarter.

227.   On this news, Fenix stock decreased from $3.49 per share of common stock at close on November 15, 2016, to an intra-day low of $3.40 on November 16, 2016, a drop of 2.5%.

### *February 21, 2017 – Form 10-Q*

228.   On February 21, 2017, pre-market, Fenix finally filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 Form 10-Q"). Defendants Robertson and Pettit signed the quarterly report on behalf of the Company.  Fenix revealed in pertinent part:

During the three months ended June 30, 2016, the Company reduced the aggregate estimated value of the acquired inventories **by an additional $3.5 million** to more accurately reflect excess and

unsaleable parts acquired as well as sales discounts given to sell certain acquired parts. **As the information necessary to make these determinations was available through March 2016, the additional reduction of $3.5 million in the estimated value of acquired inventories should have been recorded in the consolidated financial statements as of and for the three months ended March 31, 2016.** See Note 2 for further information on the correction of this immaterial error. This additional inventory adjustment also resulted in a $0.1 million increase in intangible assets (customer relationships), a $1.4 million reduction in deferred income taxes and **a $2.0 million increase in goodwill.** In accordance with ASU No. 2015-16 which is discussed in Note 2 above, this additional adjustment to acquired inventories also resulted in an additional reduction to cost of goods sold applied to the three months ended March 31, 2016 of approximately $0.6 million consisting of $0.1 million for the opening inventory mark up to fair value (see (i) below) and $0.5 million related to the lower value of acquired inventories sold between the respective acquisition dates and December 31, 2015. The $2.2 million aggregate adjustment to the opening inventory markup had a related $1.0 million deferred tax liability. The $2.2 million and the $1.0 million were previously recorded through the prior period operations and were recorded through the operating results as adjusted for the three months ended March 31, 2016 within the cost of goods sold and the tax benefit line items, respectively.

(Q2 2016 Form 10-Q, at 14.)

229.   This corrective disclosure revealed the true amounts of inventory and goodwill and Fenix's lack of internal controls.  Since Fenix's IPO in May 2015, Fenix has reduced inventory by over $14.8 million, in just a year.

230.   Fenix also revealed additional weaknesses in internal controls in the following areas:

We have evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2016, the end of the period covered by this report on Form 10-Q. Based on that evaluation, our Chief Executive

Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective because of material weaknesses in our internal control over financial reporting. These material weaknesses were attributable to (A) our lack of (i) accounting personnel with an appropriate level of accounting knowledge, experience, and training commensurate with our complex accounting issues and financial reporting requirements, (ii) procedures to prepare, document and review areas of significant judgments and accounting estimates, including purchase accounting, **contingent consideration, potential goodwill impairment and inventory valuation**, (iii) timely and systematic review by management of account reconciliations and other analyses to appropriately document and support the recording of financial information, and (iii) thorough review of significant contracts for key accounting ramifications, as well as (B) undue reliance on the findings and conclusions of third-party specialists without an appropriate level of internal review, and (C) inadequate Information Technology General Controls, including limited segregation of duties and access rights controls over information systems at Subsidiaries without compensating corporate procedures and controls. The material weaknesses described above also reflect an overall material weakness in our control environment. Certain of these weaknesses were previously described in our annual report on Form 10-K for the year ended December 31, 2015 filed on April 14, 2016.

231. This information disclosed to investors that during the Class Period Fenix lacked the proper internal controls to adequately account for its inventory valuation or its potential goodwill impairment.

232. On this news, shares of Fenix declined from an open of $2.20 per on February 21, 2017, to an intra-day low of $2.06 per share, a 6.3% drop, on unusually heavy volume.

<u>*February 21, 2017 – Press Release*</u>

233.   On February 21, 2017, Fenix issued a press release announcing its defaults under the Credit Facility.  Fenix revealed in pertinent part:

Subsequent Operating Results and Default Under Credit Facility

The Company's failure to file its second and third quarter reports on a timely basis **and its failure to comply with certain financial covenants as of June 30, 2016 and September 30, 2016, have triggered defaults under the Credit Facility with BMO Harris Bank N.A.** as discussed in more detail below and in Note 4 of notes to the condensed consolidated financial statements in the Company's Form 10-Q filing for the quarter ended June 30, 2016.  **As a result, the Company is required to reflect all of its Credit Facility debt of approximately $22 million (before capitalized debt issuance costs) as a current liability in the attached balance sheet as of June 30, 2016.**

The Company's failure to comply with the Credit Facility's financial covenants as of June 30, 2016 and September 30, 2016 was due primarily to (i) **lower asset values as a result of reductions during 2016 to the aggregate estimated fair value of acquired inventory**, which reduced the Company's borrowing base, (ii) **limits on certain non-cash adjustments** to calculate EBITDA for covenant compliance, and (iii) lower than forecasted EBITDA during the third quarter of 2016 because of a decline of approximately 5% in quarterly net revenues (as compared to a Company record level of net revenues for the quarter ended June 30, 2016) and higher operating expenses, **including significant accounting, legal and other fees primarily as a result of the transition to a new public accounting firm beginning in July 2016 and the previously reported SEC inquiry.**  Management has been and remains highly focused on maximizing cash flows from operations and, to the extent possible, minimizing the cost of outsourced professional fees.  Scrap metal prices, which declined by more than 20% on average from the second to the third quarter of 2016, have increased since September 30, 2016, and the Company's expectation is that the current high level of professional fees should decline after the first quarter of 2017.

The Company's Board of Directors and management continue to evaluate alternative strategies and capital structures, but there are no guarantees these discussions or negotiations will be successful. If the Company is unable to reach agreement with its lender, obtain waivers, find acceptable alternative financing or obtain equity contributions, its lender could elect to declare some or all of the amounts outstanding under the Credit Facility to be immediately due and payable. If this happens, the Company does not currently have sufficient liquidity to pay the then current portion of the Credit Facility. In addition, the Company has significant obligations under contingent consideration agreements related to certain acquired companies, and it will need access to additional credit to be able to satisfy these obligations. As a result of the above, **substantial doubt exists regarding the ability of the Company to continue as a going concern.**

*   *   *

Mr. Robertson commented, "Continued high professional fees and the inability to borrow under our existing credit facility **have put a strain on our liquidity**. We are working through these challenges and remain focused on executing our business plan."

Company management will not be hosting a conference call to discuss second quarter 2016 results. However, the Company plans to host a conference call after filing its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016, which it expects to complete in the near future.

234.   This information revealed to investors that as a direct result of Fenix's improper accounting over inventory valuation and goodwill, Fenix was in violation of financial covenants of the Credit Facility.  Further, this revealed the gravity of Fenix's false statements as the violations casts substantial doubt on Fenix's ability to continue as a going concern.

102

235.   On this news, shares of Fenix declined from $2.30 per share at open on February 22, 2017, to an intra-day low of $2.20 per share at close, a 4.3% drop, on unusually heavy volume.

*March 28, 2017 – Form 10-Q*

236.   On March 28, 2017, post-market, Fenix filed its quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q").  Defendants Robertson and Pettit signed the quarterly report on behalf of the Company.  Fenix revealed in pertinent part:

> Since its inception in January 2014, Fenix's primary sources of ongoing liquidity are cash flows from operations, cash provided by bank borrowings, proceeds from private stock sales, and the $101.3 million in net proceeds from its initial public offering ("IPO") of common stock completed in May 2015. The Company has incurred operating losses since its inception and expects to continue to report operating losses for the foreseeable future as it integrates the subsidiaries it has acquired (see Note 3 below) and amortizes asset write-ups and intangibles assets established at acquisition. Fenix may never become profitable if it cannot successfully integrate and grow the acquired operations and reduce the level of outside professional fees that have been incurred during 2015 and 2016. During the year ended December 31, 2015, the Company recorded a net loss of $26.0 million, and cash used in operating activities was $15.8 million. For the three and nine months          ended September 30,          2016, the Company recorded a net loss of $1.8 million and $41.7 million, respectively. **The nine month period includes an impairment of goodwill of $45.3 million** (see Note 10 below), somewhat offset by the favorable impact on costs of goods sold attributable to an adjustment to the value assigned to acquired inventories (see Note 3 below) and reductions in the estimated fair value of contingent consideration

liabilities (see Note 5 below). As of September 30, 2016, Fenix had an accumulated deficit of $72.5 million.

*    *    *

As of September 30, 2016, the Company owed $21.8 million under the Amended Credit Facility (consisting of a term loan with a balance of $9.0 million and a revolving credit facility with a balance of $12.8 million), and had $6.4 million in outstanding standby letters of credit.

As of June 30, 2016, September 30, 2016 and December 31, 2016, the Company was in breach of the Credit Facility's Total Leverage Ratio and Fixed Charge Coverage Ratio requirements and the Borrowing Base requirement for repaying over-advances (which were created by establishing lower acquired inventory values as described in Note 3 that reduced the applicable borrowing base), as well as the requirement for timely delivery of certain quarterly certificates and reports. The financial covenants are defined in Note 4. As a result, all of the Credit Facility debt is reported in the accompanying condensed consolidated balance sheet as a current liability at September 30, 2016 and there can be no further borrowings of any availability under the Credit Facility until such defaults are rectified or waived. On March 27, 2017, the Company and its subsidiaries entered into a Forbearance Agreement to the Credit Facility (the "Forbearance Agreement") with BMO Harris Bank N.A and its Canadian affiliate, Bank of Montreal. Pursuant to the Forbearance Agreement, the banks agreed to forbear from exercising their rights and remedies under the Credit Facility with respect to the above described defaults and any similar defaults during the forbearance period ending May 26, 2017, provided no other defaults occur. The Forbearance Agreement also permits the Company to add the quarterly interest payment otherwise due for the first quarter of 2017 to the principal amount of debt outstanding and defer a $250,000 principal payment due on March 31, 2017 to the end of the forbearance period.

### *Ability to Continue as a Going Concern*

The accompanying condensed consolidated financial statements have been prepared assuming the Company will continue as a going concern, which contemplates continuity of operations, realization of assets and the satisfaction of liabilities in the normal course of business. As such, the accompanying condensed consolidated financial statements do not include any adjustments relating to the recoverability and classification

of assets and their carrying amounts, or the amount and classification of liabilities that may result should the Company be unable to continue as a going concern.

*   *   *

As a result of the above, substantial doubt exists regarding the ability of the Company to continue as a going concern, which contemplates continuity of operations, realization of assets and the satisfaction of liabilities in the normal course of business **within one year from the date of this filing.**

Q3 2016 Form 10-Q, at 10-11.

237.   The above statements revealed to the market that the impairment charge was actually $45.3 million as compared to the $43.3 million previously reported. Further, the above statements indicate that the Company will not continue as a going concern within one year.

238.   On this news, Fenix's stock price dropped from a close of $1.85 on March 28, 2017, to a close of $1.55 on March 29, 2017, a drop of 16% on unusually heavy volume.

<em>June 28, 2017 – Form 8-K</em>

239.   Defendants continued to struggle to timely file the Company's Form 10-Ks and 10-Qs and to continue as a going concern.  Fenix filed a Form NT 10-K on April 3, 2017, and a Form NT 10-Q on May 16, 2017.  Fenix stated that the Company was unable to timely file "in large part to a delayed start in the year-end financial reporting and related audit field work, following the Company's recent submission of its quarterly reports on Form 10-Q for the quarters ended September

30, 2016 and June 30, 2016, due to the July 2016 change in auditors, the complexity of accounting for the Company's multiple business combinations and additional procedures on purchase accounting and inventory." (2016 Form NT 10-K; May 2017 Form NT 10-Q.).

240.   After being granted multiple extensions by the SEC to file the required financial reports, on June 28, 2017, before the market opened, Fenix filed a Form 8-K with the SEC ("June 28, 2017 Form 8-K") announcing that Fenix had entered into another amendment to the Credit Agreement and disclosing that Fenix would be de-listed from NASDAQ.  The Company stated in pertinent part:

**Item 1.01    Entry into a Material Definitive Agreement**

As previously reported, on March 27, 2017, the Company entered into a Forbearance Agreement to the credit facility (the "Forbearance Agreement") with BMO Harris Bank N.A. and its Canadian affiliate, Bank of Montreal. Pursuant to the Forbearance Agreement, the banks agreed to forbear from exercising their rights and remedies under the credit facility with respect to the Company's non-compliance with applicable financial and other covenants and any further non-compliance with such covenants during the forbearance period, provided no other defaults occurred. **The Forbearance Agreement was amended on June 23, 2017 to extend the forbearance period, which had originally expired on May 26, 2017, until August 31, 2017 and to resolve certain new defaults.** The amendment also permits the Company to add the quarterly interest payments otherwise due for the second quarter of 2017 to the principal amount of debt outstanding and defer the $250,000 principal payment due on June 30, 2017 to the end of the forbearance period.

On June 28, 2017, the Company issued a press release announcing the amendment of the Forbearance Agreement, a copy of which is attached hereto as Exhibit 99.1.

106

**Item 3.01     Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**

On June 27, 2017, the Company received notification from the Nasdaq Hearings Panel (the "Panel") that **the Panel has determined to delist the Company's shares from the Nasdaq Stock Market ("Nasdaq") and will suspend trading in the Company's shares effective at the open of business on June 29, 2017.** Nasdaq Stock Market will complete the delisting by filing a Form 25, Notification of Delisting with the Securities Exchange Commission, after applicable appeal periods have lapsed. The Panel's determination was due to the Company's continuing non-compliance with Nasdaq Listing Rule 5250(c)(1) and, in particular, its failure to file its 2016 Annual Report on Form 10-K (the "Annual Report") by the extended due date of June 23, 2017.

It is anticipated that the Company's common stock will be quoted on the OTC Pink operated by the OTC Markets Group Inc. (also known as the "Pink Sheets") subsequent to the effectiveness of the suspension of trading of the Company's common stock on Nasdaq.

The Company continues to be actively engaged with its independent auditors to complete its annual audit and quarterly review so that all delinquent periodic reports may be filed with the SEC as soon as possible.

Included in the press release, attached as Exhibit 99.1 and referenced in Item 1.01, is an announcement of the Panel's delisting decision.

(June 28, 2017 Form 8-K.)

241.  This corrective disclosure finally revealed the truth about Fenix's complete lack of internal controls and ability to continue as a going concern.  In just two years since Fenix's IPO, Fenix was forced to discount over $14 million in inventory, take a $43.3 million impairment, and has been investigated by the SEC.

Further, Fenix has not acquired a single company since its third acquisition on October 9, 2015. This final corrective disclosure revealed to the market that Fenix did not have adequate internal controls to account for its business or continue on the NASDAQ.

242.   In response to this news, on June 28, 2017, Fenix stock decreased from $1.45 per share of common stock to $0.60 per share by close, a 58.6% drop on unusually heavy trading volume.

## C.   Subsequent Class Period Statements

### *August 16, 2017 – Form 10-K*

243.   Although delisted from NASDAQ, on August 16, 2017, Fenix filed its 2016 Form 10-K with the SEC ("June 28, 2017 Form 8-K") announcing that Fenix had entered into another amendment to the Credit Agreement and disclosing that Fenix was still being investigated by the SEC for the change in its independent registered public accounting firm, its previously announced business combinations and related goodwill impairment charge, the effectiveness of its internal control over financial reporting and its inventory valuation methodology.

## D.   Defendants Acted with Scienter

244.   For the purposes of Plaintiffs' claims under the Exchange Act only, Plaintiffs allege that the above material misrepresentations and omissions were made by the Section 10(b) Defendants either intentionally and/or with reckless disregard

to accuracy for the purposes of: (a) personal financial gain; (b) inflating market demand for Fenix shares in the IPO; (c) and securing additional financing under the Credit Facility to acquire companies and continue as a going concern.

245. The Section 10(b) Defendants were aware of its inability to accurately account for goodwill and inventory in its filings with the SEC, and its breach of the financial covenants of the Credit Facility. The Section 10(b) Defendants provided investors with material information concerning the Company's financials while at the same time knowing that it would have to continue to adjust its inventory valuations and eventually take an impairment charge. As Defendants knew, these adjustments would lead to a breach of the Credit Facility's financial covenant and cast substantial doubt on Fenix's ability to continue as a going concern.

_Defendants were Motivated to Make Material Misrepresentations or Omissions_

246. The Section 10(b) Defendants' motivation behind the misrepresentations and omissions in the Registration Statement and throughout the Class Period stems from their desire to profit financially, their dire need for financing from the Credit Facility, the promise of bonuses, and the risk that the Company would be unable to pay the Section 10(b) Defendants their annual employee and director compensation.

247. The Company was in no position to go public but did so in order to raise capital for the purposes of paying bonuses and to satisfy representations the

Company made to pre-IPO investors.  From Fenix's inception in January 2014 for the purposes of acquiring the Founding Companies, Defendants Robertson and Pettit have been motivated to mislead investors.  Initially, Fenix wanted to go public at $10 per share due to agreements that related to the common stock sales in March, April and September 2014 (before the Company went public) and included provisions that obligated the holders of the common stock, including Robertson and Pettit, to compensate the investors in the First Bridge Offering and the Second Bridge Offering if the IPO price of Fenix common stock was less than $10.00 per share.

248.   In order to generate interest in the IPO, Robertson and Pettit falsely reported the value of its inventory and goodwill in order to boost the financials of Fenix.  Further, Robertson and Pettit misrepresented its corporate strategy, mainly that it could acquire 10-15 additional companies in just two years after the IPO. However, although this worked in part, Fenix was forced to go public at $8.00 per share.  As the IPO price was $8.00 per share, Robertson was forced to transfer 98,846 shares of Fenix common stock, and Mr. Pettit was forced to transfer 26,359 shares of common stock.  This resulted in a loss to Robertson of $790,768 and to Pettit of $210,872.  Had Robertson and Pettit not misled investors these losses would have been even larger.

249.   Despite Robertson's and Pettit's initial loss from going public, they both benefitted financially. By going public, Defendants Robertson and Pettit substantially benefitted as the shares they held increased dramatically in value overnight due to their newfound liquidity on the NASDAQ exchange.  While the shares held by the Section 10(b) Defendants were subject to lock-up agreements, the Section 10(b) Defendants were still able to benefit from the increase in value by using the shares as collateral for various other transactions as well as selling the shares on the open market once the lock-up agreements expired.  At an IPO price of $8.00 per share, Robertson held over $6.24 million of Fenix stock and Pettit held over $1.92 million in stock that was previously worth far less due to the fact that it was not publicly traded on the NASDAQ exchange.

250.   Further, Robertson and Pettit received bonuses for taking Fenix public. Fenix stated:

> To compensate your for your efforts on Fenix's behalf prior to its IPO, Fenix will accrue your base salary beginning on October 1, 2014, through the date of Fenix's IPO and will pay you the accrued amount as a "signing bonus" within 30 days of, and contingent upon, the IPO's closing. Until 30 days before the completion of our IPO, you may elect to receive the signing bonus in the form of that number of incentive stock options equal to four times the amount of your accrued bonus divided by the public offering price of Fenix's common stock sold in the IPO. If you elect to receive stock options, such options will be granted on the date preceding the first day of trading of our common stock and have an exercise price equal to our IPO price. If you elect to receive options and Fenix does not successfully complete the IPO, Fenix will have no obligation to pay you the accrued salary that you elected not to receive.

111

251.   Accordingly, Robertson and Pettit were highly motivate to mislead investors on the Registration Statement.

252.   Robertson and Pettit also were motivated to mislead investors during the Class Period.  By misrepresenting the inventory and goodwill, Robertson and Pettit were able to inflate the Company's ability to borrow under the Credit Facility. The Credit Facility was imperative to Fenix's ability to acquire additional companies and continue as a going concern. As stated in the Registration Statement, the completion of the IPO was contingent upon the execution of the Credit Facility. Once Robertson and Pettit disclosed the true nature of Fenix's financials and that Fenix was in breach of the Credit Facility, Fenix immediately disclosed it that there was substantial doubt as to Fenix's ability to continue as a going concern.  Accordingly, Robertson and Pettit were highly motivated to remain in compliance under the Credit Facility in order to continue as a going concern.

### Fenix Knew That its Internal Controls were Weak and that Goodwill was Inflated

253.   Throughout the Class Period, Fenix routinely had to take reductions to its inventory valuation and pay more to the Founding Companies resulting in higher goodwill.  Fenix disclosed in its registration statement that it did not use a third-party analyst when acquiring the Founding Companies, and instead engaged in arms-length transactions.   However, since the owners of the Founding Companies ultimately hired Robertson and Pettit to run Fenix, this negotiation was not an arm's

112

length transaction.  Therefore, Robertson and Pettit knew that goodwill would be inflated.

254.   CW1 also indicated that Fenix and the auditors disagreed as to the way inventory should be valued.  Further, Fenix was having difficulty implementing the Founding Companies onto one balance sheet.  However, despite these issues, Robertson and Pettit took the Company public knowing they lacked internal controls over accounting and that their valuations of inventory and goodwill were incorrect.

255.   Robertson also admitted that the Company did not get the inventory valuation worked out with its auditors until June 29, 2016.  Surprisingly, less than two weeks after Robertson stated that they came to an agreement with the auditors, BDO resigned.  The Company also stated on an investor call:

> **With better visibility in to our inventory** and procurement process, we have initiated a new coordinated pricing strategy to ensure that we capture profit and turn slower moving parts. Our goal is to increase inventory turnover and have the right parts available at the right price.

256.   The fact that Robertson and Pettit actually negotiated the acquisitions, were having discussions with the auditors, and made statement that they "had visibility into our inventory process" demonstrate that Robertson and Pettit knew the Company lacked the internal controls to account for inventory and goodwill and that Fenix was misleading investors.

257.   Based on these facts, the Section 10(b) Defendants either knew or recklessly disregarded the misleading nature of the statements made to investors.

*The Change in Auditors*

258.   The abrupt resignation of BDO also indicates that both Robertson and Pettit acted with scienter.  BDO had worked with Fenix since Fenix was founded in January 2014.  According to CW1, there were 7 to 12 auditors working at Fenix all the time.  CW1 stated that CW1 knew that Fenix had problems with inventory evaluation.  CW1 was aware that inventory evaluation was a point of controversy with the auditors, and CW1 thought the reason for the change was because Fenix could not come to an agreement with the original auditors regarding inventory valuation. Fenix was trying to get its inventory processes verified, but when Fenix tried to educate BDO about the complexities of inventory valuation the auditors did not understand.   Given that BDO is a major auditing firm and an expert in accounting, and that Robertson and Pettit refused to listen to their advice is highly indicative of scienter. Robertson and Pettit were told by their auditors that the accounting regarding inventory evaluation was wrong. Therefore, Robertson and Pettit knew that their statements were misleading but they ignored their auditor's advice and made them anyway.

259.   Further, BDO resigned on July 11, 2016, less than two weeks after taking the goodwill impairment charge and after Robertson stated they were finally on the same page as BDO regarding evaluating inventory and cost of goods sold. This timing is extremely suspicious and indicates that Robertson and Pettit refused

114

to listen to BDO.  As a result, BDO was forced to resign. This shows that Robertson and Pettit knew that the statements were misleading but they ignored BDO and misled investors.

260.   CW1 collaborates these facts. According to CW1, Fenix changed auditors because it could not come to an agreement with BDO regarding the inventory valuation.  Accordingly, BDO's unexpected and abrupt resignation at or around the time Fenix announced the impairment charge strongly suggests that BDO resigned due to a disagreement related to the inventory valuation and lack of internal controls over accounting.  Therefore, BDO's resignation as Fenix's auditor further supports a strong inference of scienter.

### *Departure of Two Audit Committee Members*

261.   The departure of two directors and members of the Audit Committee is also indicative of scienter.  Directors Richard Kogler ("Kogler") and Frank ten Brink ("ten Brink") were on the Board's compensation committee and audit committee. ten Brink was even considered the "audit committee financial expert." As the sole director at the time, Robertson installed both men as directors well before the IPO. The three were former colleagues at Stericycle, Inc. ("Stericycle"), a national reverse logistics and regulated waste management company.

262.   Just one month after going public and two months prior to Fenix's first NT filing indicating it could not submit its financials on time, the Company

announced both Kogler and ten Brink had resigned from the Board on June 11, 2015. Although Stericycle had absolutely nothing to do with recycled auto parts, Fenix stated that Kogler and ten Brink left due to an internal Stericycle policy. This timing and circumstance are highly suspicious and further contribute to a strong inference of scienter.

### *The SEC Is Investigating Fenix*

263.   In September 2016, Fenix received a subpoena from the Chicago Regional Office of the SEC requiring the production of various documents. According to Fenix's October 13, 2016 announcement, the SEC inquiry appeared to be focused on Fenix's change in its independent registered public accounting firm, its previously announced business combinations and related goodwill impairment charge, the effectiveness of its internal control over financial reporting and Fenix's inventory valuation methodology.

264.   Although Fenix stated in its most recent Form 10-K dated August 16, 2017 that it "cannot predict the duration or outcome of the inquiry," as of that time (nearly a year after receipt of the initial subpoena), Fenix was still under investigation.

265.   The fact that the SEC commenced an investigation into Fenix's operations and, importantly, that the SEC's investigation has continued up to and

through the present date, is indicative of scienter on the part of the Section 10(b) Defendants.

### *The SOX Certifications*

266.   Defendants also repeatedly represented to investors that the Company's internal controls were adequate and that Robertson and Pettit were complying with their obligations under SOX. The Defendants made these representations notwithstanding the fact that the internal controls had been problematic from the beginning and that adding an additional three companies would worsen the internal controls.

267.   For example, Defendants represented that they had disclosed all "significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." Further, Defendants stated that they routinely reviewed the Company for goodwill impairment. The fact that Defendants stated on April 16, 2016 that the Company did not have to take an impairment, and then immediately reperformed the impairment test and disclosed an impairment for the period ended March 31, 2016, is highly indicative of scienter. Accordingly, Defendants regularly reviewed the internal controls of Fenix and goodwill and knew that the internal controls were inadequate.

117

268.   In addition, the core-function of the CEO and CFO's is to monitor and ensure adequate internal controls of the Company.  For example, the Company stated that Robertson was qualified to serve on its Board of Directors due to his business experience in management and in acquisitions.

## E.    Loss Causation and Economic Loss

269.   During the Class Period, as detailed herein, the Section 10(b) Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Fenix's securities and operated as a fraud or deceit on Class Period purchasers of Fenix's securities by materially misleading the investing public.

270.   These false and/or materially misleading statements concealed the fact that Fenix was having issues continuing as a going concern and lacked the proper internal controls to account for inventory valuation and goodwill.  As the risks surrounding Defendants' conduct materialized during the Class Period, Fenix's stock price plummeted.   When the Section 10(b) Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Fenix's securities materially declined, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Fenix's securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

271. Defendants failed to disclose to investors material information concerning the internal controls of Fenix, the actual value of the Company's inventory and goodwill, violations of the Credit facility and the Company's ability to acquire additional companies, and Fenix's ability to continue as a going concern.

272. As the Class Period progressed, investors became increasingly aware of these risks that were previously undisclosed to them by the Section 10(b) Defendants. As the risks surrounding Defendants' conduct materialized during the Class Period, Fenix's stock price substantially decreased. Each decline in Fenix's stock price is evidence that the risks concealed by the Section 10(b) Defendants gradually materialized. The total decline in Fenix's stock price is attributable to the Section 10(b) Defendants' fraudulent and/or reckless conduct pursuant to the materialization-of-the-risk doctrine.

## F.   Presumption of Reliance: Fraud-On-The-Market

273. At all relevant times, the market for Fenix's securities was an efficient market for the following reasons, among others:

   (a)   Fenix securities met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

   (b)   Fenix communicated with public investors via established market communication mechanisms, including disseminations of press

releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Fenix was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    unexpected material news about Fenix was reflected in and incorporated into the Company's stock price during the Class Period.

274.    As a result of the foregoing, the market for Fenix securities promptly digested current information regarding Fenix from all publicly available sources and reflected such information in Fenix's stock price. Under these circumstances, all purchasers of Fenix's securities during the Class Period suffered similar injury through their purchase of Fenix's securities at artificially inflated prices, and a presumption of reliance applies.

275.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the U.S. Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## G.   Presumption of Reliance: Fraud-Created-The-Market

276.   In the alternative, Fenix's securities should not have been introduced into the market at the time of the IPO because it was objectively unmarketable. Contrary to the information represented in Fenix's Registration Statement, Fenix misrepresented the actual amount of inventory and goodwill from the Founding Companies.  Further, Fenix was incapable of acquiring one to three businesses per quarter.  Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have effectively manipulated the market. Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance because they relied on the integrity of the market rather than on individual fraudulent disclosures.

## H.   No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

277.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

278.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as

"forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

279.  Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Fenix who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT III

**Violation of Section 10(b) and SEC Rule 10b-5(b)
against the Section 10(b) Defendants**

280.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

281. This Count is asserted against the Section 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

282. During the Class Period, the Section 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fenix securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Fenix's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants, and each of them, took the actions set forth herein.

283. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Section 10(b) Defendants participated directly or indirectly in the

preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fenix's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Fenix's finances, accounting, and business prospects.

284.   By virtue of their positions at Fenix, the Section 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Section 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Section 10(b) Defendants.   Said acts and omissions of the Section 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each Section 10(b) Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

285. Information showing that the Section 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Section 10(b) Defendants' knowledge and control.  As the senior managers and/or directors

of Fenix, the Section 10(b) Defendants had knowledge of the details of Fenix's internal affairs.

286.   The Section 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Section 10(b) Defendants were able to and did, directly or indirectly, control the content of the statements of Fenix. As officers and/or directors of a publicly-held company, the Section 10(b) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fenix's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Fenix's securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Fenix's business, accounting, and financial condition which were concealed by the Section 10(b) Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Fenix's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Section 10(b) Defendants, and were damaged thereby.

287.   During the Class Period, Fenix's securities were traded on an active and efficient market.   Plaintiffs and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Section 10(b) Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fenix's securities at prices artificially inflated by the Section 10(b) Defendants' wrongful conduct.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Fenix's securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.   The market price of Fenix's securities declined sharply upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

288.   By reason of the conduct alleged herein, the Section 10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

289.   As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### Violation of Section 20(a) of the Exchange Act
### against the Section 20(a) Defendants

290.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

291.   During the Class Period, the Section 20(a) Defendants participated in the operation and management of Fenix, and conducted and participated, directly and indirectly, in the conduct of Fenix's business affairs.  Because of their senior positions, they knew the adverse non-public information about Fenix's misstatement of inventory, goodwill, lack of internal controls, violation of the Credit Facility, and inability to acquire additional companies or continue as a going concern.

292.   As officers and/or directors of a publicly owned company, the Section 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Fenix's financial condition and results of operations, and to correct promptly any public statements issued by Fenix which had become materially false or misleading.

293.   Because of their positions of control and authority as senior officers, the Section 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Fenix disseminated in the marketplace during the Class Period concerning Fenix's operations.  Throughout the Class Period, the Section 20(a) Defendants exercised their power and authority to

cause Fenix to engage in the wrongful acts complained of herein. The Section 20(a) Defendants therefore, were "controlling persons" of Fenix within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fenix's securities.

294.   Each of the Section 20(a) Defendants, therefore, acted as a controlling person of Fenix.  By reason of their senior management positions and/or being directors of Fenix, each of the Section 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Fenix to engage in the unlawful acts and conduct complained of herein. Each of the Section 20(a) Defendants exercised control over the general operations of Fenix and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

295.   By reason of the above conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fenix.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the class representatives;

128

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 28, 2017                    **LEVI & KORSINSKY, LLP**

                                           s/ Eduard Korsinsky
                                          Eduard Korsinsky (EK-8989)
                                          235 Main Street
                                          Hackensack, New Jersey 07601
                                          Tel.:  (973) 265-1600
                                          Fax:  (212) 363-7171
                                          Email: ek@zlk.com

                                              -and-

                                          Nicholas I. Porritt
                                          Adam M. Apton
                                          Adam McCall
                                          1101 30th Street NW, Suite 115
                                          Washington, DC 20007
                                          Tel.: (202) 524-4290
                                          Fax: (202) 333-2121
                                          Email: nporritt@zlk.com
                                          Email: aapton@zlk.com
                                          Email: amccall@zlk.com

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Tel.: (310) 201-9150
Fax: (310) 201-9160
Email: rprongay@glancylaw.com
Email: esams@glancylaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Eduard Korsinsky, hereby certify that on August 28, 2017, I authorized the electronic filing of the foregoing complaint with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

s/ Eduard Korsinsky
Eduard Korsinsky

4841-5054-2645, v. 1